CLARK–FITZPATRICK, INC./FRANKI
FOUNDATION CO., A Joint
Venture

v.

Matthew J. GILL et al.

CONSOLIDATED PRESTRESSED
CONCRETE, INC.

v.

CLARK–FITZPATRICK, INC./FRANKI
FOUNDATION CO., A Joint
Venture, et al.

Nos. 93–258–Appeal, 94–81–Appeal.

Supreme Court of Rhode Island.

Dec. 29, 1994.

Michael P. DeFanti, Providence, for Clark–Fitzpatrick, Inc.

Stephen Fanning, Providence, for Consolidated Prestressed Concrete, Inc.

Lauren E. Jones, Caroline Cole Cornwell, Jones Associates, Joseph A. Kelly, Marc De-Sisto, Providence, for defendant.

## OPINION

MURRAY, Justice.

This matter is before us on appeal by the Rhode Island Department of Transportation (state or DOT) and on cross-appeal by Clark–Fitzpatrick, Inc./Franki Foundation Co., a joint venture (CFF), and Consolidated Prestressed Concrete, Inc. (CPC), from two Superior Court judgments entered against the state for damages arising from the construction of the Jamestown–Verrazzano Bridge. For the reasons that follow, the state's appeal is sustained in part and denied in part, and the cross-appeals of CFF and CPC are denied and dismissed.

We have gleaned the following facts from the trial justice's decision and other portions of the very extensive record in the case. On September 28, 1984, DOT released contract-bid documents to potential bidders for the construction of the replacement for the Jamestown Bridge connecting the island of Jamestown with the mainland at North Kingstown. The replacement-bridge design comprised three components: (1) a trestle approach (two alternatives) for the horizontal roadway running from North Kingstown out over the water to the bridge itself, (2) a steel main-bridge alternate, and (3) a concrete main-bridge alternate. Gordon R. Archibald, Inc. (Archibald), and T.Y. Lin International (T.Y. Lin) each submitted a trestle design. Howard, Needles, Tammen and Bergdorf designed the steel alternate, and T.Y. Lin designed the concrete alternate. Contractors bidding for the project could choose between two alternatives for each portion of the bridge.

Bids were originally scheduled to open December 7, 1984, but were deferred by DOT to December 19, 1984. The lowest bid, $63,-944,000, was submitted by CFF, which bid Archibald's trestle design with T.Y. Lin's concrete main-bridge alternate. Proposing to build a prestressed, posttensioned concrete-box girder bridge, CFF planned to perform the substructure work and to subcon-tract the work on the superstructure to Moseman Construction Co. (Moseman), a specialist in cast-in-place and precast segmental concrete construction. In addition, CFF also subcontracted the job of manufacturing prestressed concrete piles and girders to CPC.

The DOT's specifications required it to award the contract within thirty days; however, award was not made to CFF until June 12, 1985. By agreement CFF waived its claim for delay, and DOT changed the completion date from September 15, 1988, to December 15, 1988. The DOT issued CFF a notice to proceed on July 9, 1985.

The contract documents applicable to the project included the Standard Specifications for Road and Bridge Construction (the blue book), supplemental specifications, plans, and special provisions. The documents were to be considered complementary. In case of a discrepancy, calculated dimensions were to govern over scaled dimensions; plans were to govern over specifications; supplemental specifications were to govern over specifications and plans; and special provisions govern over both specifications and plans.

Almost immediately upon commencement of construction by CFF, problems arose which led to multiple disputes among the parties. The most significant problem was the unexpected behavior of the soils at the bottom of Narragansett Bay (bay). As a result of soil difficulty in the bay, DOT changed the pile-design concept from a friction-pile design to a more expensive composite-pile design. The DOT and CFF disagreed on the additional cost associated with employing the composite-pile design and CFF estimated the increased cost at $30 million. The DOT estimated the cost at twelve million dollars. DOT ordered CFF to continue working under a force account. On February 18, 1988, CFF filed suit in the Superior Court, seeking injunctive relief, termination of the contract, and damages, contending that the change in pile design amounted to a cardinal change of the contract.

In March of 1988 the parties entered into a termination agreement that relieved CFF of any further obligation to perform the con-

tract and mutually released the parties from all claims except those reserved by the parties in the termination agreement. Then CPC brought suit against CFF separately, and CFF brought DOT into that action as a third-party defendant. The DOT brought counterclaims against CFF for damages arising from the termination of the contract. The cases were consolidated for a nonjury trial in the Superior Court on all unresolved claims, with CFF presenting CPC's pass-through claim against DOT.

The trial commenced in January of 1991 and continued for several months, during which time more than 4000 pages of complex testimony were produced and approximately 500 exhibits were introduced. In March of 1993, approximately twenty-one months after the trial ended, the trial justice rendered a 205–page written decision with a 132–page appendix containing findings of fact. The parties suggested a few minor revisions of the trial justice's decision, and a revised decision was entered in April of 1993. We do not summarize here each of the findings of fact by the trial justice but shall address them below as they relate to the issues before us.

Two judgments were entered in the Superior Court: (1) judgment for CFF against the state in the amount of $22,551,754, without interest, which represents $22,476,914 in compensatory damages plus $74,840 in funds withheld by the state on its counterclaims against CFF, and (2) judgment for CPC in the amount of $1,261,544, without interest, against CFF and passed through to the state. The net result of both judgments is that the state owes to CFF $23,813,298, without interest. The state, CFF, and CPC appeal from the entry of the two Superior Court judgments in this consolidated action. We shall first address the state's appeal; then we shall turn to the cross-appeals of CFF and CPC.

 In this jurisdiction the standard of review of the findings of a trial justice sitting without the intervention of a jury is extremely deferential. On appeal we do not disturb the findings of the trial justice unless he or she overlooked or misconceived material evidence or was otherwise clearly wrong. *Cerilli v. Newport Offshore Ltd.*, 612 A.2d 35

(R.I.1992). Contract interpretation is a question of law; it is only when contract terms are ambiguous that construction of terms becomes a question of fact. *Judd Realty, Inc. v. Tedesco*, 400 A.2d 952 (R.I. 1979). In situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids. *Greenwald v. Selya & Iannuccillo*, 491 A.2d 988 (R.I.1985).

 The state contends that the trial justice erred in awarding damages to CFF for the cost and delay associated with excavating the foundations of piers 14 through 20. The state argues that the contract required the foundations of those piers to be on suitably sound bedrock and contemplated embedment.

By way of background we discuss briefly the bridge-design concept at issue. Piers 14 through 20, the water piers on the Jamestown side of the bridge, were to be constructed using cofferdams and tremie seals made of concrete without pile support. For those piers the tremie seal would be poured after the cofferdam had been completely excavated. The tremie seal would be in direct contact with the bay bottom; no piles or other means of support would be used.

During construction CFF and DOT disagreed on the extent of CFF's excavating obligation in connection with piers 14 through 20. The DOT contended that CFF was required to excavate until it reached suitably sound bedrock as determined by DOT's resident engineer whereas CFF asserted it was only obligated to provide a suitably sound surface for the foundation.

The trial justice's findings of fact regarding rock excavation at piers 14 through 20 may be summarized as follows. The specifications required CFF to excavate overburden and weathered rock until it reached sound rock. Sound rock was defined as rock which cannot be removed with a clamshell bucket having teeth. Although the plans depicted a three-to five-foot embedment that T.Y. Lin estimated would occur, the plans and specifications required CFF to remove only that amount of weathered rock, if any,

that was excavatable with a clamshell bucket having teeth. There was no minimum embedment requirement in the contract. The DOT was entitled only to whatever embedment resulted, if any, from the removal of weathered rock. When CFF excavated to sound rock, DOT refused to accept the bottom as sound rock, whereupon CFF was required to excavate sound rock which was not required by the contract.

The trial justice concluded that the contract did not require by its terms embedment and the excavation of sound bedrock and awarded CFF $3,196,704 as damages and 572 days as part of its overall delay claim. We are of the opinion that the trial justice erred and we, therefore, eliminate the damages and delay awarded for rock excavation at piers 14 through 20 for the reasons that follow.

We believe the plans and the drawings designed by T.Y. Lin and used by CFF are dispositive in regard to CFF's obligation to excavate the foundations at piers 14 through 20. The overall foundation plan, as depicted in note 3 of drawing 10, expressly and unambiguously provides that "piers [14 through 20] are to be supported on foundations embedded into bedrock * * *."[1] The separate plans for the individual piers also show an embedment. Each drawing shows an approximate elevation to the top of rock and an approximate elevation to the top of sound rock. The drawings also show the bottom of the foundation (tremie seal) sitting on sound rock and embedded three, four, or five feet, plus or minus, into weathered rock. Note 5 of drawing 27 provides that "[e]levation of bottom of [F]oundation is estimated on available boring information. If in the event suitably sound rock is encountered above or below this level at the time of construction of the [F]oundation, elevation shall be modified for actual field conditions with approval of the engineer."[2] The DOT resident engineer thereby possessed the authority to change the depth of the excavation depending on actual field conditions.

Other contract documents, specifically the blue book and the special provisions, are silent with respect to whether the tremie seals were to be embedded. Section 203.9901 of the special provisions provides that excavation within the cofferdams shall proceed by

> "[r]emov[ing] overburden and weathered rock to reach sound bedrock. Sound bedrock, at any location within a foundation area shall be as determined by the Engineer. It shall be understood to be the material that cannot be excavated with a clamshell bucket having teeth, or broken up with a chopping bit or light explosive charges."

The trial justice, agreeing with CFF, interpreted this special provision as requiring CFF to excavate only the material that could be removed by a clamshell bucket having teeth. We do not interpret this section as a basis for determining whether sound rock had been reached. Nor do we perceive it as being inconsistent with the plans. Rather, we believe this section gave the DOT resident engineer the authority to determine whether adequate support was provided for the foundations and defines methods of testing the bottom. Because we find that the design plans are unambiguous and contemplated embedment, we need not look to extrinsic facts or aids. *Greenwald*, 491 A.2d at 989.

Although we are mindful of the deference given to the findings of a trial justice sitting without the intervention of a jury, in light of the foregoing it is our belief that the trial justice overlooked the plans which clearly and unambiguously showed the embedment of piers. Indeed, the trial justice noted in his findings of fact that the plans depicted a three-to five-foot embedment that T.Y. Lin estimated would occur. Accordingly we hold that the trial justice erred as a matter of law in finding that CFF wrongfully was required to excavate beyond the requirements of the contract for piers 14 through 20. The judgment in favor of CFF against the state is therefore remitted in the amount of $3,196,-704 and the 572 extra days of delay awarded for excavation at piers 14 through 20 are eliminated from the total delay analysis. We

---

**1.** *See* Appendix A.

**2.** *See* Appendix B.

remand the case to the Superior Court with instructions to recalculate CFF's delay claim.

■ The state next argues that the trial justice erred in finding that the contract did not require thermal curing of the tremies or substructure. Thermal curing is essentially a method of maintaining the heat between inner and outer portions of concrete to control the cracking forces. Thermal curing is sometimes performed in larger concrete structures like this one. The state contends that the contract required thermal curing of all massive concrete pours. During construction, DOT required CFF to perform thermal curing on both the substructure and the tremies for which CFF sought additional compensation, maintaining that the specifications required thermal curing of only the superstructure, the portion of the bridge above the pier caps.

Because this type of concrete structure was the first of its kind in New England, designers were required to submit special provisions relating to thermal curing to the extent necessitated by their respective designs. The designers modified the section of the blue book covering structural concrete masonry. T.Y. Lin's thermal-curing requirements were contained in its special-provisions section entitled "Construction Methods" and provided that massive pours of concrete be thermally cured. A "massive pour" was defined as any pour in which the concrete dimensions in three directions were five feet or more. It is this specification upon which DOT relies in its assertion that CFF was required to cure thermally all concrete pours including the tremies and substructure. It is undisputed that T.Y. Lin's section, labeled "Concrete Seal," did not require thermal curing of the tremies or the substructure.

The trial justice, having found that the contract documents were "at best ambiguous" in relation to thermal curing, concluded that CFF was not required to perform a thermal cure of the tremie seals and substructure. We agree with the trial justice's conclusion. Such a finding is supported by a fair reading of the contract documents, which we find unambiguous. The language relied upon by the state appears in a section which applied to the superstructure, not the tremies or the substructure, and the section covering concrete seals did not require thermal curing of the tremies or substructure. We conclude that the trial justice did not overlook or misconceive material evidence, nor was he otherwise clearly wrong.

■ The state next argues that the trial justice erred in finding that DOT's imposition of concrete cold-weather curing requirements was not warranted by the specifications. At trial CFF presented a claim for Moseman, the superstructure contractor, based in part on Moseman's claim that DOT had improperly interpreted the cold-weather curing requirements of the contract. During construction DOT and Moseman disagreed on what was required during the curing period of the concrete if the surrounding air temperature dropped below fifty degrees Fahrenheit for some time. Moseman took the position that the concrete merely be permitted to cure for an additional period to compensate for the period when the temperature was below fifty degrees Fahrenheit; DOT's position was that the concrete would be rejected.

At trial the importance and the expense relating to cold-weather curing concrete was described. The purpose of cold-weather curing is to ensure that freshly poured concrete will cure at temperatures that will enable it to gain strength without freezing. The cold-weather curing steps include the use of enclosures, heaters, and heated forms, and are costly.

The trial justice found that the specifications relating to cold-weather curing were "convoluted at best" and concluded that DOT incorrectly interpreted the winter-curing requirements of its own contract. The trial justice opined that the contract documents relating to curing and cold weather required: a minimum of five days at fifty degrees Fahrenheit; if the temperature dropped below fifty degrees Fahrenheit for some portion of the period, the five-day period should be extended until sufficient curing had occurred; if concrete was being poured during periods when the average daily temperature was be-

low fifty degrees Fahrenheit, cold-weather curing steps must be utilized.

The blue book § 807.03.7 provides:

"Unless otherwise specified or ordered, all concrete shall be cured for a minimum period of five days. The curing period shall begin immediately after the concrete has taken its first set, and the curing process shall continue without interruption until the end of the fifth day. Curing operations shall have prior rights to all water supply. The five day curing period is based on the use of normal standard portland cement and a curing temperature of not less than [fifty degrees Fahrenheit]. If the surrounding air temperature during the curing period specified is less than [fifty degrees Fahrenheit], the length of the curing period will be adjusted accordingly by the Engineer."

This specification recognizes that the five-day, fifty-degree curing period will not always be continuous and calls for an extension of the curing period should lower temperatures occur. The five-day curing requirement is similarly stated in § 601.03.08 entitled "cold weather concrete"; however "cold weather" is not defined. The definition of cold weather is contained in § 501.03.12(f) and provides that when "the average daily temperature is below [fifty degrees Fahrenheit], curing shall consist * * *."

Although we agree with the trial justice that the specifications are not crystal clear when read singularly, we find them unambiguous when read together. It is our belief that a fair reading of the specifications only required Moseman to take special steps to cold-weather cure concrete when the average daily temperature was below fifty degrees Fahrenheit. We therefore reject the state's argument that the contract documents required the imposition of cold-weather curing steps to the extent it argues.

 The state next argues that the trial justice's finding that the buckling of the test pile at pier 12 was due to soil subsidence is not supported by the evidence.

The foundation systems at pier 12 were supported by steel H-beam piles driven to refusal at or near bedrock. Prior to driving the pile, the contract required CFF to load test a pile to determine whether it would bear the design loads. The first test pile buckled; CFF and DOT disagreed about the cause of the buckling: CFF contended that the pile failed because of an abnormal reaction by the soils at pier 12; DOT contended that the failure was caused by CFF's failure to brace the pile at the bottom of the cofferdam as required by the contract. The trial justice concluded that both were causes of the pile failure and apportioned the damage equally between the state and CFF.

The state asserts that the trial justice's finding that the test pile buckled because of soil subsidence is not supported by any legally competent evidence and is therefore an error of law. We disagree.

At trial the state presented the testimony of Milton Davisson (Davisson), who was duly qualified as an expert in pile driving. Davisson testified on direct examination that the cause of the buckling of the test pile was CFF's failure to provide lateral restraint. On cross-examination Davisson conceded that the pipe pile would provide necessary bracing if it was embedded in the soil. Paul McEnery (McEnery), CFF's project manager, also rendered an opinion concerning the cause of the test pile's failure. McEnery testified about how the load-test pile was to be secured to the bottom of the cofferdam. He further testified that on the basis of his general experience he determined that the pile buckled because of a lack of lateral support in the soil to hold it. A photograph of the test pile that depicted the location of the buckling was also presented at trial.

As noted earlier, we shall not disturb a trial court's finding unless it is shown to be clearly wrong. This issue was extensively litigated at trial. The trial justice considered the testimony presented as well as the exhibits in making his decision. His review of the evidence was careful and thorough. We, therefore, shall not disturb the trial justice's findings.

The state next argues that the trial justice erred in awarding CFF damages for remedial work it performed at the pier–16 tremie resulting from the construction methods im-

posed on CFF by DOT. The trial justice found that DOT was responsible for CFF's failure to pour a satisfactory tremie at pier 16. The state does not contest the trial justice's findings on DOT's role in causing the tremie defects; rather, it asserts that CFF's failure to file a formal claim letter under the standard specifications of the contract bars its claim. Alternatively, the state contends that CFF's claim is precluded for its failure to give the state notice pursuant to the provisions of G.L.1956 (1990 Reenactment) § 37–13.1–1.

■ With respect to the state's argument that CFF's claim is barred for its failure to give the state notice pursuant to § 37–13.1–1, we hold that this argument cannot now be brought before this court. As we have often stated, arguments on appeal that have not been specifically presented to the trial justice for his or her determination cannot be properly brought before us. *632 Metacom Associates v. Pub Dennis of Warren, Inc.,* 591 A.2d 379, 381 (R.I.1991). We have thoroughly searched the record and find no such trial presentation. Accordingly we shall not now entertain the state's argument.

■ The contract provision for claims contained in the blue book provides:

"105.17—Claims for Adjustments and Disputes. If, in any case, the Contractor deems that additional compensation is due him for work or material not clearly covered in the contract or not ordered by the Engineer as extra work, as defined herein, the Contractor shall notify the Engineer in writing of his intention to make a claim for such additional compensation before he begins the work on which he bases the claim. If such notification is not given, and the Engineer is not afforded proper facilities by the Contractor for keeping strict account of actual cost as required, then the Contractor hereby agrees to waive any claim for such additional compensation."

The purpose of the claim-notice provision is to ensure that an owner has the opportunity to examine the work at issue and to monitor the performance and costs of repair and/or extra work.

It appears that CFF maintained, and the trial justice agreed, that notification of a possible claim was given by CFF to DOT in a letter dated February 23, 1987; that DOT had the opportunity to monitor and keep strict account of the costs necessary; that the notification was prior to the beginning of the remedial repairs; and that the approval for those repairs was made by DOT. The trial justice noted that form should not be made superior to substance and found that the lack of formal notice under § 105.17 was not a waiver in this instance. We agree.

The state relies on this court's decision in *Rhode Island Turnpike and Bridge Authority v. Bethlehem Steel Corp.,* 119 R.I. 141, 379 A.2d 344 (1977), in support of its position that CFF waived its right to claim damages for the remedial work. In that case we rejected a contractor's claim for damages for its failure to comply with the provisions of § 105.17 where the contractor did not even allege compliance with the provision. In *Rhode Island Turnpike,* the contractor first raised the claim during the trial, and there was no formal or substantive compliance with the notice provision. That case, therefore, is distinguishable from the instant case in which the state does not dispute it received notice from CFF in a letter dated February 23, 1987, indicating that it might have a claim arising from the problem at pier 16. The state also actually monitored the performance and cost of the repairs and consulted with experts about the cause of the problem. The state's reliance on *Rhode Island Turnpike* is therefore misplaced.

Accordingly we affirm the trial justice's finding that CFF"s failure to give formal notice under § 105.17 was not in this instance a waiver of a claim for the remedial work necessary to cure the defect at the pier–16 tremie.

■ The state also argues that the trial justice erred in concluding that the twenty-seven-day period from the contract award to the issuance of a notice to proceed was the state's responsibility and a basis for delay damages. The state contends that there was no provision in any of the contract documents that required the issuance of a notice to proceed within a specified period after the

contract award. The state further contends that it had no obligation to issue a notice to proceed and the absence of such notice had no impact on the contractor.

The contract was awarded to CFF on June 12, 1985; the preconstruction meeting was held on July 8, 1986. The formal notice to proceed was not issued to CFF until July 9, 1985, twenty-seven days after the award of the contract. The CFF claim of twenty-two days of delay damages was premised on its assertion that the notice to proceed should have been issued within five days of the contract award. The state objected to any award of delay for the period between the award of the contract and the issuance of notice to proceed.

As an initial matter we note that the state incorrectly argues that the trial justice awarded to CFF twenty-seven days of delay based on the late notice to proceed; the trial justice's award was for twenty-two days. The trial justice held that in the circumstances in particular, the six-month period between bid opening and contract award, five days was more than adequate time to hold a preconstruction conference and issue a notice to proceed and that since the notice to proceed did not issue until twenty-seven days after award, CFF was entitled to include the twenty-two days in its delay analysis.

The blue book § 108.02 provides that the notice to proceed "will stipulate the date on which it is expected the Contractor will begin the construction and from which date contract time will be charged. Commencement of work by the Contractor may be considered as a waiver on his part of this notice." This provision does not require the issuance of a notice to proceed within a certain period after the award of the contract. However, the special provisions did require that a preconstruction meeting be held before the commencement of construction. Thus, it is evident that CFF could not begin construction until DOT held a preconstruction meeting. That meeting was not held until July 8, 1985. The trial justice found that DOT's delay in holding the meeting was unreasonable, which delay interfered with CFF's contractual obligation to complete the project by the contract completion date.

We are of the opinion that the trial justice's findings support the award of twenty-two days to CFF. He did not overlook or misconceive the evidence, nor was he otherwise clearly wrong.

■ The state next contends that CPC was not entitled to any recovery beyond the amount owed under the contract for CPC's satisfactory work provided to the time of the contract termination between CFF and the state.

By way of background we briefly describe CPC's involvement in the project: CPC was CFF's subcontractor to provide the girders for the trestle approach and the prestressed, precast concrete piles for the original pile design to support the trestles and the piers on the North Kingstown side of the bridge. The piles were expected to be driven to depths of between sixty and ninety feet; the girders were for the bridge's superstructure. Upon award of the contract CPC began mobilizing its Florida-based plant, undertaking steps to bring its plant into conformity with the Rhode Island specifications prior to producing the piles. Piles could not be produced until the lengths were determined from pile-load tests performed by CFF in the field. Test-pile load tests revealed a serious soil problem in the bay. As a result, the friction pile foundation system had to be abandoned, and CFF canceled the order for production piles from CPC. The DOT also refused to accept girders from CPC on the basis that they were cracked. The pile system was redesigned to a composite pile. The design phase lasted over a year and a half, during which time DOT requested CFF, and in turn, CFF requested CPC, to stand ready to produce the concrete portion of the composite piles whereupon CPC agreed to stand by and reserved its plant capacity. However, in March of 1988, DOT and CFF terminated their contract and CFF provided written notice to CPC that the subcontract was terminated for convenience. In April of 1989, CPC sued CFF in Florida and in Rhode Island, alleging in its complaints that it had been damaged by DOT and CFF's failure to take delivery of the piles resulting from the change of the original pile design. In addition CPC claimed damages from

CFF's termination of the subcontract resulting from the mutual termination of CFF's contract with DOT. Because CPC's claim was based on DOT's conduct, CFF filed a third-party claim against DOT and presented CPC's claim as a pass-through claim against DOT in the Superior Court. The damage claim was composed of direct costs, unabsorbed overhead costs, and lost purchase-order profit.

At trial the state contended that the termination-for-convenience provision of CFF's subcontract with CPC limited CPC's right to recover damages to the unit-price provision of the contract and subcontract. The state contended that CPC was limited to payment for satisfactory work done to the time of termination. The state asserts that pursuant to the holding in *Severin v. United States*, 99 Ct.Cl. 435 (1943), *cert. denied*, 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944), CFF and, therefore, DOT, had no liability to CPC except payment for the delivered product.

In *Severin* it was held that a general contractor cannot recover from an owner unless the general contractor is liable to the subcontractor. The state contends that CFF was not liable to CPC as a matter of law. The trial justice rejected the state's argument that the termination-for-convenience provision in the subcontract limited CPC's claim on the basis that the provision precludes a claim by CPC for lost profits in the event of termination. The termination provision of CPC's subcontract with CFF provides:

> "Clark–Fitzpatrick shall have the right to terminate this order for convenience, if there is a termination of Clark–Fitzpatrick's contract with the Owner, by providing Supplier with a written notice of termination, to be effective upon receipt by Supplier. If this order is terminated for convenience, Supplier shall be paid the amount representing costs which are due from the Owner for its work, as provided in the Contract Documents, after payment therefore by the Owner to Clark–Fitzpatrick."

The trial justice found that CPC was entitled to recover damages since CPC's inability to recover its costs, overhead, and profit on the

project resulted from DOT's cancellation of the orders for the originally designed concrete friction piles and the redesigned composite piles, *not* from CFF's termination of its subcontract with CPC pursuant to the termination agreement between DOT and CFF. He further found that DOT's conduct in rejecting the girders was unreasonable. He awarded CPC $1,261,544, without interest, which represents direct expenses and overhead costs but not lost profit. The state does not contest the specific amount of damages awarded.

 A subcontractor can pass its claims through to the owner via the general contractor. *Universal Fiberglass Corp. v. United States*, 537 F.2d 400, 404 (1976). A subcontractor is entitled to the benefit of its bargain when its subcontract is terminated because the owner has breached its contract with the prime contractor.

In this case the trial justice found that the state breached its contract with CFF when it changed the pile design, which breach caused CFF to breach its contract with CPC. It is upon this basis that the trial justice awarded CPC damages. We are of opinion that the *Severin* doctrine is inapplicable in the instant case because the trial justice's award was not based on the DOT/CFF termination in March of 1988 but on the breach resulting from the changed pile design caused by DOT. It was that breach that caused CFF to renege on its promise to purchase the original piles and girders from CPC. Accordingly we affirm the trial justice's ruling in regard to the award to CPC.

 The state's last assertion of error is that the trial justice erred in rejecting two of its counterclaims. The state sought $5.9 million that it claimed it expended in repairing the pier–14 cofferdam constructed by CFF. In addition the state sought $1.3 million that it claimed it expended in redesigning the construction option for lifting the spans into place and replacing tie-down loops. Both claims were rejected by the trial justice as a matter of law on the basis that the claims were not preserved by the state in the termination agreement. The relevant language of the termination agreement provides:

"3. The parties waive any claim for damages arising after the date of termination of the contract. This waiver includes any claim by Clark–Fitzpatrick for anticipated profits that it might have earned after the date of termination if the contract had been completed and a waiver by the State of Rhode Island for any and all increases in costs resulting from the reprocuring and constructing the bridge by or through a new contractor.

\* \* \* \* \* \*

"6. All work completed and materials stored to date by Clark–Fitzpatrick and paid for by the State are hereby deemed accepted and, except as described below, the State of Rhode Island does hereby waive any and all claims resulting from latent defects attributable solely to the work performed by Clark–Fitzpatrick and/or its subcontractors."

The termination agreement provided for acceptance of all work done and paid for and a waiver of all claims unless the work done and paid for was defective as result of a latent defect. The trial justice found that the provisions of paragraph 6 referred only to the work performed on the permanent structure, and that it did not apply to forms or the cofferdams that were used by the contractor to build the permanent structure since they were construction aids. The trial justice therefore opined that even if the problem with the cofferdam was latent, the defect was not covered by paragraph 6 because construction aids were not included under the definition of work. Although the word "work" was not specifically defined in the termination agreement, the trial justice found that "work" meant the permanent bridge itself. The latent-defect reservation therefore applied to the work subject to inspection to determine whether it was in conformity with T.Y. Lin's bridge plans and specifications. The state contends that although the term "work" was not defined in the termination agreement, it was so defined in the bridge contract between CFF and DOT as to include construction aids. The trial justice did not specifically address this argument in his decision; however, he looked to the conduct of the parties subsequent to the signing of the termination agreement and the circumstances surrounding the agreement to determine the intent of the parties with respect to the application of this provision.

The trial justice noted that CFF wrote to DOT, stating that it made no warranty concerning the usability of the cofferdams by subsequent contractors and that DOT accepted and acquiesced in the "as is" condition. Moreover, DOT required future contractors to assume the condition of the cofferdams in place or to include in their bid money for the repairs on any existing damage. The trial justice concluded that DOT's conduct up to the trial indicated that it accepted the notification and interpretation of CFF concerning the construction aids.

It is our belief that the trial justice's interpretation of paragraph 6 as not covering construction aids is supported by ample evidence in the record. The termination agreement's use of the term "work" was ambiguous, and the trial justice's reference to the conduct of the parties and the surrounding circumstances was appropriate to determine its intended meaning. *Flynn v. Flynn*, 615 A.2d 119 (R.I.1992). We therefore are persuaded that the trial justice's denial of DOT's counterclaim based on the repairs to the cofferdam at pier 14 was correct. For the same reasons we affirm the trial justice's denial of the state's counterclaim for redesigning the construction option for lifting the spans into place and replacing the tie down loops.

We next turn to the cross-appeal of CPC, whose main argument relates to the trial justice's denial of prejudgment interest on the damage award. Because CFF also raises that argument, we shall address them jointly below.

■ In addition CPC and CFF also contend that the trial justice erred in denying CPC its claim for lost purchase order profit on the original contract. In the Superior Court trial CPC claimed that it was entitled to lost profit arising from CFF's breach of its subcontract with CPC; CPC claimed it was entitled to $933,428 as profit on the original contract. In denying that request, the trial

justice reasoned that "such an award would fly in the face of the realities of the situation as they existed from the time of the failure of the first test pile." However, CPC was awarded direct expenses and overhead costs.

Our reading of the trial justice's decision convinces us that he awarded CPC damages on the basis of the evidence. He found that when the first test pile failed by August of 1986, the parties were aware that the original friction-pile design could not be used; from the time of the first test-pile failure CPC was "hoping" to receive a contract from CFF once the composite-pile design was completed. He further found that DOT and CFF acted as though CPC would receive a contract for the composite piles, and in that expectation CPC incurred substantial expenses in readying its production facility in Florida. Then CPC failed to receive the new order through no fault of its own. Thus the trial justice found that the parties should have understood that the original contract was canceled in 1986, yet CPC was nonetheless entitled to damages on the basis of the actions it took in expectation of receiving a contract for the alternate composite-pile design.

Next CPC suggests that the trial justice's award of damages is contradictory in that he awarded it damages for unabsorbed overhead yet denied it contract profits. We disagree. The trial justice found that the parties canceled the original purchase orders but induced CPC to stand ready for nearly eighteen months to produce the newly designed composite piles. The overhead was, therefore, an actual expenditure incurred by CPC whereas the profit was an expectation or hope of receiving the replacement contract for the composite piles.

In arguing its entitlement to lost-profit damages, CPC relies on *Aiello Construction, Inc. v. Nationwide Tractor Trailer Training and Placement Corp.*, 122 R.I. 861, 413 A.2d 85 (1980). We agree with CPC's reliance on *Aiello* to the extent that it recognizes that upon establishing a breach by an owner, a contractor is entitled to proven expected profits for full performance. We disagree, however, with the application of that case to the instant case on the basis that the trial

justice specifically found that the parties understood that the original contract was canceled. Moreover, in *Aiello* we noted that "a court must select the most appropriate remedy depending upon the factual posture of the case and the election of remedy by the plaintiff." 122 R.I. at 867, 413 A.2d at 88. In this case the trial justice followed that reasoning in determining what losses CPC had sustained. We conclude that in light of the circumstances of the instant case the trial justice's factual findings support the damage award on CPC's claim. The trial justice's denial of lost profits to CPC is therefore affirmed.

■ We now consider the cross-appeals by CFF and CPC alleging that the trial justice erred in denying the award of prejudgment interest on the two Superior Court judgments against the state. In their cross-appeals CFF and CPC claim that the state has waived its immunity to an award of prejudgment interest by the enactment of G.L. 1956 (1990 Reenactment) § 37–13.1–1. It is the position of CFF and CPC that the trial justice erroneously interpreted this statute as less than a complete waiver of the immunity defense.

Both CFF and CPC claim that they are entitled to interest pursuant to G.L.1956 (1985 Reenactment) § 9–21–10, which provides in pertinent part that in "any civil action in which a verdict is rendered or a decision made for pecuniary damages," statutory interest shall be added by the clerk of the court. The issue before us may be stated thus: Does the prejudgment-interest statute § 9–21–10 apply to actions against the state brought pursuant to § 37–13.1–1. This is a question of first impression in Rhode Island. Our answer to this query depends strictly upon our construction of the two statutes in question.

"This court has held that because the right to receive interest on judgments was unknown at common law as it is a right created by statute, the court will strictly construe any statute that awards interest on judgments so as not to extend unduly the changes enacted by the [L]egislature. *Gott v. Norberg,* R.I., 417 A.2d 1352, 1357 (1980); *Atlantic Refining Co. v. Director*

*of Public Works,* 104 R.I. 436, 441, 244 A.2d 853, 856 (1968). Because we are strictly construing the statute, we should avoid reading anything into the statute by implication.

"It is also the general rule that a statute waiving sovereign immunity, which is also in derogation of common law, must be strictly construed and whatever right of recovery is to be ascertained against the state must be expressly mentioned in the waiver of the immunity statute. *Brown University v. Granger,* 19 R.I. 704, 36 A. 720 (1897). The waiver of a common-law right inuring to the state, like the waiver of any other known right or privilege should not be lightly inferred. *City of Providence v. Solomon,* R.I., 444 A.2d 870, 875 (1982). The court must find that the relinquishment or abandonment of a known right or privilege is intentional. *Marrapese v. State,* 500 F.Supp. 1207, 1212 (D.R.I.1980). In construing a waiver of immunity statute, it is presumed that the Legislature did not intend to deprive the state of any part of its sovereign power unless the intent to do so is clearly expressed or arises by necessary implication from the statutory language. *Brown v. Granger, supra.*" *Andrade v. State,* 448 A.2d 1293, 1294–95 (R.I.1982).

We now turn to the two statutes in question. The waiver-of-immunity statute in question in this case is § 37–13.1–1 and in pertinent part reads:

"Any person, firm, or corporation which is awarded a contract * * * for the design, construction, repair, or alteration of any state highway, bridge, or public works * * * may, in the event of any disputed claims under the contract, bring an action against the state of Rhode Island * * * for the purpose of having the claims determined * * *. No action shall be brought under this section later than one year from the date of the acceptance of the work by the agency head as so evidenced * * *. The action shall be tried to the court without a jury. All legal defenses except governmental immunity shall be reserved to the state."

The right to prejudgment interest is not clearly expressed in the statute. This court must therefore determine whether the abandonment of the right "arises by necessary implication from the statutory language." *Andrade,* 448 A.2d at 1295.

In reading § 37–13.1–1 in its entirety we find it obvious that the Legislature intended to have a judicial determination concerning those disputed claims which arise under a public-works contract. The relevant phrase here we believe is "disputed claims." The Legislature was clearly limiting a plaintiff's cause of action to those "claims arising under the contract." Nowhere in the statute is prejudgment interest mentioned. We believe this omission is dispositive. The right to prejudgment interest is not a claim arising under the contract; it is a statutorily created right that is an abrogation of the common law. *Andrade,* 448 A.2d at 1294. We noted in *Andrade,* that "[s]tatutory interest is not part of the substantive right of action but is exclusively an incident attached thereto by legislative fiat after such right has been adjudicated." *Id.* at 1295.

We next consider whether any other provision of § 37–13.1–1 evidences a legislative intent to waive the state's immunity from prejudgment interest on any judgment arising from such suit. Both CFF and CPC assert that the language providing that "[a]ll legal defenses except governmental immunity shall be reserved to the state" precludes the state from asserting governmental immunity as a defense to prejudgment-interest claims. With this assertion we disagree. We are aware of the strict standard of statutory construction we must apply. We are, however, persuaded that this provision refers solely to the state's defenses to claims arising under the contract and not to defenses to prejudgment-interest claims. We reach this conclusion after examining the schematics of the statute which relate solely to the aspects of bringing a disputed claim. We note that it delineates which contracts are affected by the statute; it requires notice of the disputed claims to the agency; it sets forth a statute of limitations applicable to such claims, and specifies in what situation a party is barred from making a claim.

Directing this court's attention to the case law of other jurisdictions which have considered this same issue and reached a contrary conclusion, CFF strongly urges this court to restrict our holding in *Andrade* to its facts and follow the course taken by the State of Connecticut, which denies tort claimants prejudgment interest but allows contractors the award of prejudgment interest. *See White Oak Corp. v. Department of Transportation,* 217 Conn. 281, 295–300, 585 A.2d 1199, 1206–08 (1991).

We are cognizant of the case law in Connecticut as well as in other jurisdictions that have ruled on the issue; however, we shall decline to read anything into the statute by implication. "Had the legislature intended to expose the state treasury to the additional financial burden of prejudgment interest it could have so provided easily." *Andrade,* 448 A.2d at 1295. Because the Legislature failed to do so, we decline to incorporate the prejudgment interest statute into § 37–13.1–1. Accordingly we hold that § 9–21–10 does not apply to actions against the state brought pursuant to § 37–13.1–1. The trial justice's denial of prejudgment interest on the two judgments against the state is therefore affirmed.

> "As this court has previously declared, 'we will not attribute to the General Assembly an intent to depart from the common law unless such an intent is expressly and unmistakably declared.' *Westerly School Committee v. Westerly Teachers' Association,* 111 R.I. 96, 102, 299 A.2d 441, 445 (1973); *see also Johnston Businessmen's Association v. aaRussillo,* 108 R.I. 257, 274 A.2d 433 (1971)." *Andrade,* 448 A.2d at 1295.

In reaching our holding today, we note that CPC, as CFF's subcontractor, would be entitled to an award of prejudgment interest from CFF. However, for the above reasons its claim must be denied because it was presented by CFF as a pass-through claim against the state. Further, as the trial justice found, although CFF was entitled to present as part of its damages a claim for prejudgment interest that it may have been liable for to CPC, both CFF and CPC failed to present any evidence of CPC's prejudgment-interest claim to the trial court as part of CFF's damage claim. The trial justice therefore properly denied CPC prejudgment interest on its claim.

For the foregoing reasons the state's appeal is sustained in part and denied in part, the cross-appeals of CFF and CPC are denied and dismissed, the total monetary judgment in favor of CFF against the state is remitted in the amount of $3,196,704, 572 days are eliminated from CFF's total delay claim, and the case is remanded to the Superior Court for recalculation of CFF's delay claim.

## APPENDIX B