[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
Before this Court is the post trial motion of the Defendant, The WideCom Group, Inc., for a new trial or, in the alternative, to amend the judgment. The Plaintiff, Roger Carlsten, opposes this motion. Carlsten sued WideCom, as well as John Keenan, Vincent DiGiulio and Schneider Securities, on claims of racketeering, breach of contract, conversion, fraud and vicarious liability. After a nonjury trial, the Court found that the Plaintiff failed to make out a claim for racketeering, but that he prevailed on the claims of breach of contract, conversion and fraud against DiGiulio. Additionally, the Court held that WideCom was vicariously liable for DiGiulio's tortious conduct by virtue of an agency relationship. Jurisdiction is pursuant to Superior Court Rule of Civil Procedure 59(a)(2).
 FACTS AND TRAVEL
WideCom is a Canadian corporation the original purpose of which was to manufacture and market the wide fax technology (fax machines capable of transmitting large blueprint sized documents and the attendant accessories) invented by one of the founding family members, Raja Tuli (Raja). The company was organized in 1990 by members of the Tuli family and was in the midst of increased demand and anticipated exponential growth by 1992, when it initiated an effort to raise capital through a private placement offering. In pursuit of working capital, the company sought the services of Schneider Securities Group, an investment firm located in Providence, Rhode Island. In February of 1992, the two entities entered into a Letter of Intent Agreement, whereby Schneider was to assist WideCom in raising $900,000 through a private offering within a nine month period. The agreement included an escape clause whereby it would terminate if Schneider failed to reach $900,000 in due time. Subsequently, Schneider failed to meet the deadline, and the agreement expired by its own terms. However, WideCom continued the effort to raise capital in Rhode Island with the assistance of one former Schneider associate and one soon-to-be former associate, Jack Keenan and Vincent DiGiulio, respectively. It is the relationship of these two persons, more particularly the latter, to WideCom that forms the basis for this motion.
During the time that Widecom and Schneider were still courting each other pursuant to the letter of intent, Suneet Tuli (Suneet), Widecom's Vice President of Marketing, made a presentation to potential investors in Warwick, Rhode Island in June of 1992. Suneet was touting the potential of the company and explaining the private placement wherein the company was offering 36 $25000 units, each consisting of 13,888 shares of the company, plus a $6954 note bearing interest at 12% per annum. The Plaintiff was among the dozen or so potential investors in attendance. He was there at the behest of his then-Schneider account executive, DiGiulio. DiGiulio and Keenan were both also in attendance at the June presentation, although Keenan was not employed by Schneider at that time. DiGiulio and Keenan were then both retained by WideCom to continue pursuing investors subsequent to the termination of the Schneider intent agreement, and the two promptly began collecting investor funds for the stock offering.
By the summer of 1993, WideCom was looking ahead to a potential public offering and became concerned about violating the blue sky laws[1] in some states, including Rhode Island. Pursuant to the private placement status of the initial offering, the company had not filed with any state or federal governments. (Plaintiff's Exhibit #30) (memo regarding blue sky laws). In order to satisfy the Rhode Island rules, the company was advised that the aggregate amount of the offering could not exceed $1,000,000 and that no commission or other compensation could be paid in furtherance of the stock offering. Id.
Around the same time, Raja entered into a retroactive consulting agreement with DiGiulio and Keenan, "the Consultants," in the summer of 1993. The agreement referred to the period from July 1, 1992 through June 30, 1993; stated that all past services were consulting in nature; and committed 125,000 shares of Raja's own stock as payment because "WideCom's financial advisors recognize[d] that the issuance of new shares by WideCom to the Consultants could adversely affect WideCom's capital structure." (Plaintiff's Exhibit #42) (Marketing and Management Consulting Agreement). The agreement noted that "beginning in early 1992 WideCom was desirous of retaining the services of the Consultants" and that WideCom "was prepared to issue some of its shares to the Consultants in consideration for services." Id. However, the agreement did not mention services in promotion of the stock offering; rather, it only spoke of the Consultants' assistance in marketing and demonstrating WideCom products. Id.
Still, it is undisputed that Keenan and DiGiulio both took money from investors in exchange for WideCom stock, and by July of 1993, they had remitted at least $291,500 to WideCom, which represented $331,250 in stock sales less a $44,750 retained fee. (Plaintiff's Exhibit # 28). WideCom, in turn, issued the appropriate number of shares and notes relative to these amounts. It is clear that the Plaintiff was among those early depositors eager to invest in WideCom. On June 27, 1992, he issued the first of three checks to the WideCom Escrow Account. This first check in the amount of $25,000 was given to DiGiulio, who promptly deposited it in an account at Fleet. The account was opened in the name of Schneider WideCom Escrow Account d/b/f Vincent R. DiGiulio. On September 21, 1992, Plaintiff issued a second check, this one for $75,000, which was endorsed by Jack Keenan and also promptly deposited into the same account. This account was then closed in October of 1992, and a new Fleet account opened in the name of WideCom Escrow Account d/b/f John F. Keenan. Plaintiff's final check of $17,500 was deposited into the second Escrow account in June of 1994.
Some time after Plaintiff had remitted the first $100,000 but before the final $17,500 transaction, DiGiulio had the Plaintiff sign two Share Agreements, which are dated November 1993. (Plaintiff's Exhibits #6 and #7). This was also subsequent to the agreement between Raja and the Consultants. The first share agreement recites that the Plaintiff was buying 65,000 shares of WideCom stock for a stated price of $117,500. The second share agreement is for the purchase of 5000 shares at a price of $17,500. Both agreements are "by and between Vincent DiGiulio, on behalf of an inside shareholder who currently owns shares of WideCom," and the Plaintiff. Id. Both share agreements state that the shares will be "made available as soon as practicable after the public offering." Id.
Subsequent correspondence among WideCom and Keenan and DiGiulio notes that the Plaintiff was due 65,000 shares and that he had paid $117,500.
Plaintiff never received any WideCom shares or notes. He became suspicious after the company went public in 1995 and ultimately filed suit.
 STANDARD OF REVIEW
Sitting without a jury at trial, the judge on a subsequent motion for a new trial is constrained by Rule 59(a)(2). Said rule provides:
 "New trials — Amendment of judgments. — (a) Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues . . . (2) in an action tried without a jury, for any of the reasons for which rehearing have heretofore been granted in suits in equity in the courts of this state. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment." Super. R. Civ. P. 59(a)(2) (2004).
Therefore existing law determines the grounds upon which a motion for a new trial may be granted. Izzo v. Prudential Ins. Co., 114 R.I. 224, 228,331 A.2d 395, 397 (1975). It is now well established law that in civil actions heard without a jury, the court may review its own decision but may only grant the order of a new trial if it finds either a manifest error of law in the judgment previously entered or that there is newly discovered evidence of sufficient importance to warrant such an order.Town of Glocester v. Lucy Corp., 422 A.2d 918, 919 (R.I. 1980) (citingColvin v. Goldenberg, 108 R.I. 198, 208, 273 A.2d 663, 668-669 (1971) (researching the history of the rehearing motion and the reasons for limiting its scope)).
The Rhode Island Supreme Court has repeatedly emphasized that there are strict criteria required to establish a manifest error of law, stating "[f]or our purposes a manifest error of law in a judgment would be one that is apparent, blatant, conspicuous, clearly evident, and easily discernible from a reading of the judgment document itself." Bogosian v.Bederman, 823 A.2d 1117, 1119 (R.I. 2003) (quoting American Fed'n ofTeachers Local 2012 v. Rhode Island Bd. of Regents for Educ., 477 A.2d 104,106 (R.I. 1984)). Accordingly, "[n]ot all apparent errors of law give rise to a petition for a rehearing but only those which are manifestly wrong and appear on the pleadings, record and decree, excluding the evidence." Town of Glocester, 422 A.2d at 920 (quoting Colvin,108 R.I. at 207, 273 A.2d at 668-69).
 WIDECOM'S MOTION FOR A NEW TRIAL
Since no new evidence is advanced in support of this motion, a manifest error of law on the face of the judgment must be established in order for Defendant to prevail. WideCom proffers six grounds for finding apparent error.
 VARIANCE BETWEEN PLEADINGS AND JUDGMENT
First, WideCom suggests that there is a variance between the pleadings and the judgment that amounts to manifest error of law. WideCom claims that the Plaintiff's pleadings were insufficient because they failed to mention even the existence of the 1993 Share Agreements upon which this Court based its decision. It is contended that this omission was unfair and in contravention of our pleading system because it deprived Defendant of the necessary fair notice of the claim. The Plaintiff counters that the pleadings were adequate to give the Defendant notice since the first amended complaint alleged breach of contract and made specific reference to the June 1994 check for $17,500. However, a meticulous scrutiny of the pleadings is unnecessary since the Defendant's failure to object to their introduction into evidence amounts to implied consent to treatment of the Share Agreements as if they had been raised in the pleadings.
Rule 8 of the Superior Court Rules of Civil Procedure requires a pleading to include a "short and plain statement of the claim showing that the pleader is entitled to relief." Super. R. Civ. P. 8(a)(1) (2004). The thrust of the pleading is to provide the opposing party with "fair and adequate notice of the type of claim being asserted." Bresnick v.Baskin, 650 A.2d 915, 916 (R.I. 1994) (where surveys eliminated any boundary dispute in an action for trespass and conversion, the court denied plaintiff's subsequent motion to amend complaint to advance a theory of adverse possession because it was a different type of claim). Yet, the pleading need not contain either "the precise legal theory" upon which a party's claim is based or "the ultimate facts that must be proven in order to succeed." Haley v. Town of Lincoln, 611 A.2d 845, 848 (R.I. 1992) (reversing a judgment on the pleadings because factual allegations were too incomplete to be dispositive and there were facts to be fleshed out at trial that could potentially affect the liability of the parties). In fact, the liberal construction of the pleading rules favors simplicity over redundancy as long as the opposing party will not be prejudiced by any unfair surprise. Id. Furthermore, Rule 15(b) allows a party to amend a pleading to conform to the evidence presented at the trial. Super. R. Civ. P. 15(b) (2004). Specifically, Rule 15(b) provides that "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Id. "[I]mplied consent to the trial of the issues not within the pleadings is usually manifested by failure to object to evidence." Porter v. B.B.F. Inc., 122 R.I. 891, 892,408 A.2d 616, 616 (1979).
In the instant case, Count II of the Plaintiff's first amended complaint is a claim for breach of contract. The complaint alleges that the Plaintiff's three checks to the WideCom Escrow Account represented payments to purchase WideCom stock and/or promissory notes and that the Defendants breached by failing to provide the stock and/or promissory notes as promised. However, as WideCom contends, the complaint does not specifically mention the November 11, 1993 Share Agreements, and it is suggested that this omission resulted in unfair and inadequate notice to the Defendants of the grounds upon which relief was to be based. Given the liberal construction of the pleading rules, this Court finds the Defendant's claim of error must fail.
In the first place, the pleadings clearly stated the type of claim — breach of contract — that Plaintiff was asserting. Cf. Bresnick,650 A.2d at 916 (adverse possession was different type of claim). This claim was predicated on the Plaintiff's assertion that he gave money to purchase stock that was never received. The existence of the Share Agreements is an additional fact, fleshed out in the trial, which supports the Plaintiff's claim. Additionally, the Defendant was aware of the existence of the Share Agreements prior to trial and not only failed to object to the introduction of the documents into evidence, but argued that they were valid and binding agreements. It follows that the breach of such binding agreements would naturally become an issue before the Court. Therefore, the defendant had adequate notice and impliedly consented to trial of this issue, and this Court correctly adhered to Rule 15(b) by considering the issue as if it had been raised in the pleadings. Porter, 122 R.I. at 892, 408 A.2d at 616.
 IDENTITY OF INSIDE SHAREHOLDER
The Defendant's next contention is that the clear and unambiguous language of the documents precludes this Court's determination that WideCom was a party to the 1993 Share agreements and that the Defendant DiGiulio was more likely selling his own shares at that time. It is alleged that this determination amounts to manifest error of law. The Defendant asserts that since the contracts name the seller as an "inside shareholder who currently owns WideCom shares," WideCom itself cannot possibly be a party. The Defendant further suggests that this Court violated the parole evidence rule by permitting evidence of the parties' prior oral agreements to alter a critical unambiguous contract term — the identity of the shareowner. The Plaintiff counters that DiGiulio was acting as an apparent agent of WideCom at the time of the execution of the agreements, and WideCom is thereby bound.
It is understood that "a contract is ambiguous only when it is reasonably and clearly susceptible of more than one interpretation."Rotelli v. Cantanzaro, 686 A.2d 91, 94 (R.I. 1996) (citing W.P.Associates v. Forcier, Inc. 637 A.2d 353, 356 (R.I. 1994)). If there is such susceptibility, then construction of an ambiguous contract term is a question to be decided by the trier of fact. Id. at 95. (citingClark-Fitzpatrick, Inc./Franki Foundation Co. v. Gill, 652 A.2d 440, 443
(R.I. 1994)). To assist the fact finder, parole evidence may be admitted to clarify a contract term that is ambiguous on its face. Id. (citingSupreme Woodworking Co. v. Zuckerberg, 82 R.I. 247, 252, 107 A.2d 287, 290
(1954)).
Under Rhode Island Law, a corporation may own its own stock. G.L. 1956 § 71.1-5 (a) ("[a] corporation has the right to purchase, take, receive, or otherwise acquire, hold, own, pledge, transfer, or otherwise dispose of its own shares"); see also Cleveland v. Jencks Manuf. Co. 54 R.I. 218,221, 171 A. 917, 918 (1934). Additionally, an insider is a person whose relationship to a corporation affords access to "information intended to be available only for a corporate purpose." In Re Cady, Roberts Co., 40 S.E.C. 907, 912 (1961) (explaining why insider status gives rise to a fiduciary duty to disclose); see also, Chiarella v. United States,445 U.S. 222, 227 (1980) (citing In Re Cady, Roberts Co. for definition of insider). Furthermore, the Rhode Island Uniform Securities Act includes corporation in its definition of person. G.L. 1956 § 7-11-101
("`Person' means a natural person, corporation, . . . or any other legal or commercial entity.").
Contrary to the Defendant's assertion that an "inside shareholder who currently owns WideCom stock" is an unambiguous term that could only refer to some person other than WideCom itself, the 1993 Share Agreements are patently unclear as to which inside shareholder they were referring. Therefore, it was proper and necessary for this Court to consider evidence of the prior oral agreements, as well as other extrinsic evidence, to clarify the ambiguous term. Additionally, WideCom itself clearly is a `person' possessed with corporate purpose information who conceivably owned WideCom stock. In fact, the evidence presented at trial showed that the only insiders actually possessed of WideCom stock at the time of the 1993 agreements were Raja and feasibly the corporation itself. See (Plaintiff's Exhibit # 32) (Marketing and Management Consulting Agreement, July 1993). Accordingly, this Court found that the contract was ambiguous on its face and properly considered parole evidence.
The Defendant accentuates the July 1993 consulting agreement wherein Raja, ostensibly acting in his individual capacity, designated 125,000 of his own shares to Keenan and DiGiulio as sole compensation for the latter parties' efforts as consultants to the corporation, and suggests that DiGiulio was selling his own shares to Carlsten. Yet, there is no evidence to show that these shares were ever received by Keenan and DiGiulio, and neither one testified at trial (in fact, there is evidence that Keenan and DiGiulio subsequently sued WideCom and Raja in pursuit of these shares). Rather, evidence suggests that at the time of the consulting agreement, the parties and their advisors felt it necessary to alter the manner in which shares were disseminated in order to comply with the state's blue sky exemptions. (Plaintiff's Exhibit # 30) (memo regarding blue sky laws). Thus, only "currently owned shares," as opposed to new issues, could be transferred. There was further evidence to suggest that as late as July 1994, Keenan and DiGiulio were expecting the company to deliver shares to Carlsten. (Plaintiff's Exhibit # 35) (memo from Keenan to Suneet asking for shares to be delivered to Carlsten and others before the IPO). Again, Raja and WideCom itself were the only insiders who "currently" owned shares and it was very important for WideCom to adhere to the blue sky rules.
The credible evidence further showed that the Plaintiff had issued three checks to the WideCom Escrow Account in the aggregate amount of $117,500 to purchase WideCom stock, that the Plaintiff intended to purchase the shares from WideCom prior to the public offering, that Defendant DiGiulio deposited the checks in an account from which he and Keenan paid WideCom for stock for investors, and that WideCom was aware that Plaintiff had deposited money with DiGiulio for the purpose of purchasing WideCom shares. Accordingly, this Court determined that at the time of the November 1993 Share Agreements, DiGiulio was acting on behalf of WideCom in order to fulfill the company's fund raising goal while maintaining compliance with state law. This determination of principal liability was amply supported by the evidence.
 VIACARIOUS LIABILITY
The Defendant's next claim of error must fail on the coattails of its immediate predecessor. Defendant asserts that this Court committed manifest error of law in finding WideCom vicariously liable based on the 1993 Share Agreements. The Defendant's argument is twofold: first, the evidence upon which this Court based its finding was insufficient, as a matter of law, to establish that an agency relationship ever existed between WideCom and DiGiulio, and second, it was unreasonable for the Plaintiff to believe that DiGiulio was acting on behalf of WideCom at thetime of the execution of the 1993 Share Agreements. This Court finds that the evidence relied on is sufficient in light of the other relevant findings, and that it was perfectly reasonable for the Plaintiff to believe that DiGiulio was acting within his authority when he executed the 1993 Share Agreements on behalf of WideCom.
"An agent's apparent authority to contract on behalf of his principal arises from the principal's manifestation of such authority to the party with whom the agent contracts. Menard Co. Masonry Building Contractorsv. Marshall Building Systems, Inc., 539 A.2d 523, 526 (R.I. 1988). "Such manifestation by the principal to the third person need not be in the form of a direct communication," . . . but "may come from other indicia of authority." Id. Extension of some degree of authority to an agent may suffice to communicate to a third party that the agent has even greater apparent authority, unless the principal further communicates a limitation to the third person. Id. (holding that representative had apparent authority to modify contract because the same representative had negotiated and executed the original contract on company's behalf); seealso Calenda v. Allstate Insurance Co., 518 A.2d 624, 628 (holding that directed verdict inappropriate where inference could be made that insurance agent had apparent authority to extend time for cancellation based on his authority to bind company to policy and on company's deference to his determination as to the extent of his authority). However, in cases where a third person should be aware of limitations, the principal must expressly manifest his consent. Parrillo v. Chalk,681 A.2d 916, 917-19 (R.I. 1996) (holding that third parties may not rely on any apparent "settlement authority claimed by an attorney who (1) is not the lawyer who brought the complaint, (2) has failed to enter any appearance in the case, and (3) was not otherwise an attorney of record in the matter" because "an attorney has no authority to settle a case on behalf of a client unless the client has authorized the attorney to do so").
The Defendant asserts that Plaintiff's testimony was insufficient as a matter of law to support this Court's finding that DiGiulio was ever acting with the apparent authority to bind WideCom. This assertion supposes that even if Carlsten's testimony were true, it does not amount to a manifestation by WideCom that DiGiulio had the requisite apparent authority. However, it is clear that the manifestation need not be explicit as long as the third party reasonably believes the authority exists. As this Court noted, the 1993 Consulting Agreement memorialized the fact that the DiGiulio and Keenan were actually authorized to perform certain functions up until July of 1993, including maintaining a Rhode Island sales office. Carlsten v. The WideCom Group, Inc., et al., 2003 R.I. Super. LEXIS 76, 46-47, C.A. No. PC 97-1425. Additionally, it is clear that both men were authorized to collect funds for stock purchases. Carlsten testified that at the 1992 meeting, where Suneet was touting the assets of the company in a room containing a select group of potential investors for a private stock placement, Suneet "confirmed that Keenan and DiGiulio were working on behalf of WideCom." Id. at 47. This confirmation by an officer of the company clearly served to put Carlsten on notice of the relationship that actually did exist at that time between DiGiulio and WideCom. Thereafter, WideCom never contacted Carlsten directly to notify him when the agency relationship had terminated or that there was any limitation to the extent of DiGiulio's authority. Furthermore, since the sale was pursuant to a private placement and most presumably exempt from the usual requirements for securities transactions, there was no public registration requirement, satisfied or unsatisfied, that would have put Carlsten on constructive notice about a limitation to DiGiulio's power to act for the company.
The Defendant next claims that it was unreasonable for Carlsten to believe that DiGiulio was acting on behalf of WideCom at the time of the execution of the 1993 Share Agreements. However, this argument is predicated on the fact that an inside shareholder could not possibly be the corporation itself. It follows that if the corporation could actually be the "inside shareholder," then believing such to be the case is understandable, particularly in light of the parties' prior dealings. He understood from the 1992 meeting that DiGiulio was working on behalf of WideCom in furtherance of the company's private placement effort. Additionally, the characterization of the sale as a private placement exempted the company from the ordinary course of securities regulations, and he had no other form of agreement relative to this sale with which to compare. Therefore, it was reasonable to believe that this was the manner in which the company committed to disseminate the shares to him at that time.
 SUBSTITUTION FOR ESCROW AGREEMENTS
The Defendant next contends that this Court committed manifest error of law in holding that the first 1993 Share Agreement constituted a binding contract in substitution of the 1992 escrow agreements for two reasons. First, the 1993 Share Agreement does not expressly mention the 1992 escrow agreement, and second, the 1992 escrow agreement was unenforceable pursuant to the statute of frauds. Defendant claims that since the 1992 agreements were unenforceable, there was no underlying obligation between the parties to be subsumed by the 1993 Share Agreements. Defendant's claims are without merit. In the first place, the 1993 Share Agreement contains a clause that states:
 "Section III. Entire Agreement. The parties agree that all prior oral and written agreements, if any, are integrated with and superseded by this agreement and no variation of the terms of this agreement can be permitted without the written amendment of this agreement as of the month and year first written."
Considering that the total dollar amount paid equals $117,500 and Plaintiff only remitted an additional $17,500 at the time of the Share Agreements, any prior oral agreement relative to the initial deposits is clearly integrated pursuant to this clause. In the second place, "the statute of frauds does not make an oral promise . . . unlawful, or prohibit its performance, but only prevents the maintenance of an action upon it." Haynes v. Nice, 100 Mass. 327, 329 (1868). Rather, the purpose of the statute is to guard against perjury by one claiming under an alleged oral agreement. Smith v. Boyd, 553 A. 2d 131, 133 (R.I. 1989). In fact, in Rhode Island, if a party subsequently admits to all the elements of a valid contract, the oral contract will even be enforced by the court. Id. (citing Peacock Realty Co. v. E. Thomas Crandall Farm, Inc.108 R.I. 593, 601-02, 278 A.2d 405, 409-10 (1971)). Clearly, the statute does not negate the existence of the oral obligation, but merely renders it unenforceable unless and until it is somehow taken outside the statute. Therefore, the first 1993 Share Agreement substitutes for and takes the underlying obligations between WideCom and Carlsten — the one to sell and the other to purchase — outside the statute of frauds.
 CONSIDERATION
Defendant's next claim is that this Court misapplied the June 1994 payment in finding that the Plaintiff had paid adequate consideration for the First 1993 Share Agreement. Plaintiff counters that adequate consideration was established and that Defendant's claim is inappropriate at this juncture.
A motion for a new trial in a nonjury civil action is very limited in scope and does "not reach errors in conclusions of fact from the evidence." Colvin, 108 R.I. at 207, 273 A.2d at 669. It is not the office of the trial Court to correct the error if "a decree was merely erroneous when the law is applied to the evidence." Id., 273 A.2d at 669. Rather, since the appeals court is readily available in nonjury cases, if such errors exist, they are properly corrected by way of an appeal. Id. at 206, 273 A.2d at 668.
A motion for a new trial is an improper vehicle through which to address Defendant's claim because the claim is based solely on a disagreement with the Court's factual findings. Defendant's claim of error is predicated on the assertion that this Court misconstrued the evidence in finding that consideration was sufficient. Constrained by the limited scope of Rule 59, this Court is not at liberty to revisit its factual conclusion that the June 1994 payment represented the requisite consideration.
 DAMAGES
Finally, Defendant asserts that this Court incorrectly determined the amount of damages by calculating the number of shares owned based on the number of shares Plaintiff would have received pursuant to the oral agreements. A review of the record reveals that damages were based on a total share amount of 60,552, which was reduced by a 10 to 8 reverse stock split to 48,442 and then multiplied by $12.25, the price per share in 1996 when Plaintiff discovered the breach. However, the contract, as well as all subsequent communications between the parties relative to Plaintiff, clearly denotes 65,000 as the number of shares purchased.
Superior Court Rule of Civil Procedure 60(a) provides that "[c]lerical mistakes in judgments, orders or other parts of the record and errors therein arising from oversight or omission may be corrected by the court at any time of its own initiative or on the motion of any party." Incorrectly calculated damage awards are tantamount to "clerical" errors pursuant to rule 60(a) and the Rhode Island Supreme Court has held that, as such, they are amendable by the court "at any time." Ankner v.Napolitano, 764 A.2d 712, 714-15 (R.I. 2001) (improper interest rate applied to damage award); DiLuglio v. Providence Auto Body, Inc.755 A.2d 757, 778 (R.I. 2000) (improper date applied to damage award).
In the instant case, Defendant correctly points out that 60,552 is an incorrect number of shares upon which to base damages. Therefore, in accordance with rule 60(a), the judgment will be amended accordingly. The contract upon which this Court based liability denotes 65,000 as the number of shares purchased. After the reverse stock split, the Plaintiff was due 52,000 shares. Therefore, Plaintiff is entitled to $663,000 (52,000 × $12.25/share).
 CONCLUSION
For the foregoing reasons, this Court denies the Defendant's motion for a new trial. Damages are amended in accordance with the terms of the contract as set forth above.
[1] Blue sky laws are state statutes governing securities transactions and they are so named because they were originally said to be "aimed at promoters who `would sell building lots in the blue sky in fee simple.'" Louis Loss and Joel Seligman, Fundamentals of Securities Regulation, 11 (5th ed. 2004) (quoting Mulvey, Blue Sky Law, 36 Can. L.T. 37 (1916)).