DECISION
Before this Court is a Motion in Limine filed by the Defendant, E.W. Burman, Inc., ("Burman") regarding the admissibility of evidence relating to certain labor costs allegedly incurred by Plaintiff, Greenwich Northeast, Inc., ("GNI") during a construction project. Burman primarily seeks to exclude such evidence based on the doctrine of collateral estoppel. For the reasons set forth herein, this Court grants Burman's motion.
 I Facts and Travel
This matter arises from the construction of a new chapel and mausoleum at the Swan Point Cemetery located at 585 Blackstone Boulevard in Providence, Rhode Island (the "Project"). (Compl. ¶ 4.) Pursuant to a written construction management agreement (the "Prime Contract") with The Proprietors of Swan Point Cemetery (the "Owner"), Burman acted as the general contractor for the Project. (Pl.'s Pre-Trial Mem. ¶ 3.) The Prime Contract stated a contract price of $5,242,549.00. Id. at ¶ 5. In December of 2005, Burman entered into a subcontract with GNI with respect to the masonry block work on *Page 2 
the Project (the "Subcontract"). (Def.'s Pre-Trial Mem. Ex. B: Subcontract.) The Subcontract stated a contract price of $103,000.00 for the construction of the chapel and mausoleum "skeletons." Id. This Subcontract price equaled the Scheduled Value of the Concrete Masonry Unit Work in the Prime Contract. (Pl.'s Pre-Trial Mem. ¶ 8.)
After commencing the masonry work, the parties subsequently modified the Subcontract by change order dated March 16, 2006 ("Change Order No. One") to expand GNI's scope of stonework to include the furnishing and installation of a granite veneer over the exterior walls per architectural specifications (the "Specifications").[1] (Def.'s Pre-Trial Mem. Ex. C: Change Order No. One.) Change Order No. One, drafted by Burman, detailed the Specifications for the exterior stonework and increased the Subcontract by $385,000.00 to a total Subcontract price of $488,000.00. Id. The Specifications required the use of a special type of granite previously placed on hold at a nearby quarry and the implementation of certain dimensions, cuts and joints during installation. Id. The type of granite placed on hold was known as "Rustic Rubble," which was supplied by the quarry in random shapes, thus requiring hand-trimming in the field to effectuate installation pursuant to the Specifications. (Def.'s Pre-Trial Mem. ¶ 15.)
Not long after the execution of Change Order No. One, the parties made the decision to incorporate another type of granite called "Ashlar," which was saw-cut at the quarry and produced in larger pieces. (Pl.'s Pre-Trial Mem. ¶ 16.) While the Ashlar granite was more expensive, it generally required less trimming in the field.Id.; Def.'s Pre-Trial Mem. ¶¶ 18-19. The Architect ultimately approved GNI's mock-up granite *Page 3 
veneer that included both Rustic Rubble and Ashlar stone in early April of 2006, subject to certain conditions (the "Approval"). (Def.'s Pre-Trial Mem. ¶¶ 16-17.) GNI contends, however, that considerable hand-trimming and cutting of the Ashlar stone in the field was nonetheless necessary to fulfill the conditions set forth in the Approval and to achieve the final appearance of the stone envisioned by the Architect. (Pl.'s Pre-Trial Mem. ¶¶ 18-20.) It is undisputed that as a result of the decision to use Ashlar granite, GNI requested that Burman issue another change order to account for expected increases in purchasing and labor costs. (Def.'s Pre-Trial Mem. ¶ 20; Pl.'s Pre-Trial Mem. ¶¶ 22-24.) It is also undisputed that before reaching any agreement concerning a price adjustment to the Subcontract, GNI commenced installation of the exterior stonework by the end of April of 2006. (Def.'s Pre-Trial Mem. ¶ 21; Pl.'s Pre-Trial Mem. ¶¶ 25-26.)
Over the following months, Burman and GNI communicated regarding an appropriate price adjustment to the Subcontract to account for the use of Ashlar stone. (Def.'s Pre-Trial Mem. ¶ 22; Pl.'s Pre-Trial Mem. ¶¶ 25, 27.) The parties, however, dispute the extent and substance of these negotiations. The record reflects that on September 25, 2006, Burman issued a second change order to the Subcontract, increasing the Subcontract price by $100,000.00 for the "[a]dded cost for using cut granite and any additional labor required to meet [the] architect's approved installation" ("Change Order No. Two"). (Def.'s Pre-Trial Mem. Ex. D: Change Order No. Two.) Change Order No. Two also provided a completion date of October 31, 2006 and stipulated that liquated damages in the amount of $5000.00 per day applied to any delays in completion past that date. Id. Upon issuance of Change Order No. Two, the Subcontract price increased to $588,000.00. *Page 4 
GNI maintains that it substantially completed its work on the Project sometime in October of 2006 but for minor punch list items. Burman avers, however, that the Owner did not accept the work on the Project as substantially complete until December 15, 2006. (Pl's. Pre-Trial Mem. ¶ 42; Def.'s Pre-Trial Mem. ¶ 27.)
Burman contends that the $588,000.00 Subcontract price, indicated as "New Subcontract Amount" on Change Order No. Two, is the final agreed-upon fixed contract price encompassing the entire scope of GNI's work. Burman asserts that is has paid GNI $558,600.00 of the Subcontract price after accounting for what Burman deems to be appropriate back charges against GNI in the amount of $29,400.00. (Def.'s Answer ¶ 12.) GNI, however, presents this Court with a differing set of facts concerning the negotiation and formation of Change Order No. Two. GNI contends that it continued to work on the Project from April through August of 2006 while its requests for a Subcontract price adjustment were met by less than favorable responses from Burman. (Pl.'s Pre-Trial Mem. ¶¶ 22-31.) While GNI does not dispute that it signed Change Order No. Two, GNI maintains that the $100,000.00 increase of the Subcontract price was an agreed-upon partial payment that in no way constituted a final price adjustment. (Compl. ¶ 13; Pl.'s Pre-Trial Mem. ¶ 45.)
In support of this contention, GNI relies on a document entitled "Addendum to Change Order No. One to Subcontract," signed by GNI principal, John Abatecola, and allegedly sent by facsimile to Burman on September 22, 2006 (the "Addendum"), three days prior to executing Change Order No. Two. (Pl.'s Opposition to Motion (hereinafter, "Pl.'s Opp.") Ex. B: Addendum.) The facsimile cover sheet states in part: "[p]er our telephone conversation . . . we have attached an addendum to C.O. #1 in which we are *Page 5 
willing to accept the additional $100,000.00 as discussed, only with the terms herein stated in the inclosed [sic] addendum."Id. The Addendum itself identifies the dispute between GNI and Burman concerning the price adjustment and indicates that GNI accepts $100,000.00 as an "additional payment," without prejudice, reserving all rights to resolve by agreement or arbitration whether monies beyond the $100,000.00 are owed by Burman at the conclusion of the Project. Id. The Addendum is not signed by Burman, and Burman disclaims ever receiving the facsimile. (Def.'s Mem. in Support of Motion at p. 3.) On September 25, 2006, the parties executed Change Order No. Two without reference to the Addendum. (Pl. Opp. Ex. B: Addendum.)
GNI filed its Complaint against Burman on January 29, 2008, and its Amended Complaint on February 14, 2008, seeking damages based on alleged breaches of the Subcontract and the agreement purportedly set forth in the Addendum. GNI seeks payment of the $29,400.00 remainder of the stated $588,000.00 Subcontract price, as well as $32,618.00 of "extra costs" resulting from the use and shaping of the Ashlar, and $104,031.19 in labor costs incurred in connection with the Ashlar stonework. (Pl.'s Pre-Trial Mem. ¶¶ 44-46.) On March 6, 2008, Burman answered the Amended Complaint and filed a multi-count Verified Counterclaim against GNI.[2]
This case was reached for trial with a date certain of November 30, 2010. Burman filed its motion in limine on that same date. This Court deferred trial after conference until January 21, 2011, based on its view that resolution of legal issues connected with the motion in limine potentially could obviate the need for a trial or *Page 6 
shorten any trial. The parties have submitted memoranda in accordance with an agreed upon briefing schedule.
Upon first glance, certain evidence GNI intends to present in its case-in-chief seemingly creates an issue of material fact as to the extent, substance, and intention behind the negotiations and agreement relative to the $100,000.000 payment under Change Order No. Two. Burman seeks to exclude this evidence, however, based on findings of fact and law in prior litigation involving Burman and the Project. A deeper look into this past litigation, and the parties involved, reveals a new layer of factual circumstances not readily apparent from the face of the pleadings in the instant matter.
In early 2007, an entity known as Alpha Omega Construction, Inc. ("Alpha Omega") instituted a mechanics' lien action against the Owner of the Project for nonpayment on an alleged masonry subcontract. This action, captioned Alpha Omega Construction,Inc. v. The Proprietors of Swan Point Cemetery and E.W. Burman, C.A. No. 07-1220 (R.I. Super. Ct. 2007) (the "Alpha Omega Litigation"), centered on Alpha Omega's claim for $104,000.00 in labor costs (the "Labor Costs") incurred while allegedly working as a subcontractor for GNI on the Project. In response, Burman, on behalf of itself and the Owner, filed a verified complaint seeking to dismiss and discharge the lien in accordance with the post-deprivation procedures set forth in § 34-28-17.1 of Rhode Island's mechanics' lien statute. See
R.I. Gen. Laws § 34-28-17.1 (1956). GNI was not a party to the Alpha Omega Litigation.[3]
The Alpha Omega Litigation went to trial in the Rhode Island Superior Court before Justice Gilbert V. Indeglia. It revealed the details of the masonry work at the *Page 7 
Project and the interrelation of the parties involved. Testimony indicated that Fred Abatecola owned the entity known as Alpha Omega. He and John Abatecola, a principal of GNI, are brothers. (Def.'s Ex. 180: Alpha Omega Decision Transcript, 5/21/07, Indeglia, J. (hereinafter, "Decision") at p. 275.) GNI brought Alpha Omega onto the Project to supply labor to alleviate an increasing delay in completing the stonework. (Decision at p. 283.) While the parties fervently disputed whether Alpha Omega was indeed a sub-sub contractor on the Project, the trial justice ultimately found that Alpha Omega's workers were essentially "employees" of GNI and not retained pursuant to any subcontract. Id.
The trial justice based this conclusion on several findings of fact, including, but not limited to, finding: (1) that the Subcontract between Burman and GNI prohibited subcontracting by GNI absent prior approval from Burman and that GNI never asked Burman for consent to subcontract labor to Alpha Omega; (2) that there was no proof of contract between GNI and Alpha Omega, and the scope of work performed by Alpha Omega involved the same work to be performed by GNI under the Subcontract; (3) that a letter from John Abatecola admitted as evidence at the hearing stated that GNI and Alpha Omega were in a "merger process," indicating that Alpha Omega laborers worked as employees of GNI; (4) that Burman's principal and managers believed the Alpha Omega laborers to be employees of GNI; and (5) that there was no indication of Alpha Omega's presence, such as uniforms or trucks, at the Project site. (Decision at pp. 282-85.) The trial justice's determination that Alpha Omega was not a subcontractor of GNI but that its laborers acted as employees of GNI was critical to the Court's ultimate decision to dismiss Alpha Omega's mechanics' lien as without probability of judgment in its favor. *Page 8 
(Decision at p. 284-85; see § 34-28-17.1.) As a result of this determination, the Court found that certain lien waivers signed by GNI[4] were legally binding on Alpha Omega. (Decision at pp. 280, 284.) Thus, the trial justice concluded that any claim for payment by Alpha Omega should have been brought against GNI, rather than Burman.[5] Id. at p. 285.
During the Alpha Omega Litigation, the parties addressed the distinct issue of whether GNI and Burman had agreed on a fixed Subcontract price of $588,000.00 or whether Burman had agreed to pay for granite veneer work on a cost-plus basis beyond the $588,000.00 stated on Change Order No. Two. During closing arguments, counsel for Alpha Omega argued that "Alpha [was] not asking the plaintiff [Burman] to pay twice. Rather, Alpha [was] asking that the plaintiff be required to pay the full and fair price of the labor that it received once." (Def.'s Ex. 180: Alpha Omega Litigation Hearing Transcripts (hereinafter, "Tr.") at pp. 265-66.) In particular, Alpha Omega averred that GNI consistently took the position that the cost of the stonework was more than what GNI had been paid and that GNI had assured Alpha Omega throughout its performance that an additional adjustment was forthcoming to compensate for Alpha Omega's outstanding labor costs.Id. at pp. 265-67.
Counsel for Burman countered this contention, arguing that the Subcontract was for a fixed price, that Alpha Omega knew GNI had a fixed price subcontract, and that *Page 9 
Alpha Omega had an opportunity to speak out during price adjustment negotiations if the fixed amount did not cover Alpha Omega's expenses. Id. at p. 258. When questioned as to the effect of Change Order No. Two in particular, Edward Burman — principal of Burman — testified that Change Order No. Two reflected the "final adjusted contract price" and that Burman "never" entered into a cost-plus change order arrangement with GNI for the disputed stonework.[6] Id. at pp. 180-81. Based on the documents presented and the testimony elicited at the hearings, the trial justice concluded that "Alpha was aware that both Greenwich and Burman were working on a fixed-price contract, which should have alerted Alpha to make any alleged subcontracts known to Burman especially if the contract was based on the cost-plus basis." (Decision at p. 284.)
After the trial court's issuance of an order dismissing Alpha Omega's complaint to enforce the mechanics' lien, Alpha Omega filed a timely appeal to the Rhode Island Supreme Court.[7] In its appeal, Alpha Omega primarily argued that the trial justice's finding that Alpha Omega's personnel were employees of GNI was erroneous and contrary to the evidence. Alpha Omega Construction,Inc. v. The Proprietors of Swan Point Cemetery and E.W. Burman,Inc., 962 A.2d 733, 737 (2008). In upholding the trial justice's decision, the Rhode Island Supreme Court noted that after executing the Subcontract, "E.W. Burman and Greenwich subsequently agreed to two change orders that expanded the scope of the work to be done by Greenwich and increased the amount of the subcontract to $588,000.00. The new contract price was negotiated during several meetings between Burman and John [Abatecola], some of which Fred [Abatecola] also *Page 10 
attended." Id. at 736, n. 5. The Court further stated that "E.W. Burman paid Greenwich in full, in accordance with the terms of the fixed-price contract between the companies," notwithstanding the retained amount of approximately $30,000.00 for repair work alleged to have been done improperly by Greenwich.Id. at 736.
In the instant action, GNI seeks to recover from Burman approximately $166,000.00 in extra costs over and above what GNI has already been paid, plus an additional sum representing 10% overhead and profit. GNI admits that $104,031.19 of this amount represents labor costs incurred, but not yet paid, to Alpha Omega. (Pl.'s Opp. p. 7.) In its motion in limine, Burman now seeks to preclude GNI from offering evidence of what Burman suggests is a "pass-through" claim on behalf of Alpha Omega on the grounds that: (1) the Rhode Island Superior Court's decision in the Alpha Omega Litigation, as affirmed by the Rhode Island Supreme Court, previously decided the issue of Alpha Omega's entitlement to additional compensation, and (2) the "pass-through" doctrine, discussed infra, is not available to GNI under the factual circumstances of this case. As to collateral estoppel, Burman maintains that a sufficient identity of issues and identity of parties exists to prevent GNI from essentially "re-litigating" the terms of the Subcontract, the applicability of the Lien Waivers, and any alleged entitlement to costs beyond the Subcontract price.
In its opposition to Burman's motion in limine, GNI contends that the requirements for application of collateral estoppel are not present in this case. Specifically, GNI avers that there exists no identity of issues or sufficient privity between Alpha Omega and GNI to enable this Court to apply the doctrine. GNI relies heavily in this regard on the Addendum and language within the Subcontract relative to change *Page 11 
orders. As to Burman's pass-through doctrine argument, GNI maintains that the doctrine has no relevance to GNI's claims and need not be considered. In response to GNI's opposition, Burman has filed a Reply Memorandum expounding on its collateral estoppel argument.
 II Analysis
A motion in limine is "widely recognized as a salutary device to avoid the impact of unfairly prejudicial evidence upon the jury and to save a significant amount of time at the trial." Owens v.Silvia, 838 A.2d 881, 889 (R.I. 2003) (citing BHG,Inc. v. F.A.F., Inc., 784 A.2d 884, 886 (R.I. 2001) (quotingFerguson v. Marshall Contractors, Inc.,745 A.2d 147, 150 (R.I. 2000))). "It is well settled that `a motion in limine is not intended to be a dispositive motion.'" BHG,Inc., 784 A.2d at 886 (quoting Ferguson, 745 A.2d at 150). Rather, "it has been used in this state primarily to `prevent the proponent of potentially prejudicial matter from displaying it to the jury . . . in any manner until the trial court has ruled upon its admissibility in the context of the trial itself.'"Id. (quoting Ferguson, 745 A.2d at 150-51) (quotingState v. Fernandes, 526 A.2d 495, 500 (R.I. 1987));see, e.g., Dodson v. Ford Motor Co., C.A. No. PC-96-1331, 2006 WL 2405872 (R.I. Super. Ct. Aug. 17, 2006) (Savage, J.) A determination to exclude evidence "is within the sound discretion of the trial justice and, absent a showing of abuse of this discretion, [the Rhode Island Supreme Court] will not disturb a ruling concerning the admissibility of evidence."Fravala v. City of Cranston ex rel. Baron,996 A.2d 696, 703 (R.I. 2010) (quoting Perrotti v.Gonicberg, 877 A.2d 631, 642 (R.I. 2005) (quoting State v.Lynch, 854 A.2d 1022, 1035 (R.I. 2004))). *Page 12 
 A Pass-Through Claim
The pass-through doctrine permits a general contractor who is liable to a subcontractor to bring an action against the owner to recover on behalf of the subcontractor. Bd. of Governors forHigher Educ. v. Infinity Const. Services, Inc.,795 A.2d 1127, 1128-29 (R.I. 2002) (citing Clark-Fitzpatrick,Inc./Franki Foundation Co. v. Gill, 652 A.2d 440, 449 (R.I. 1994) and Jacor, Inc. v. Cardi Corp.,673 A.2d 1077, 1078 (R.I. 1996) (per curiam) (acknowledging the doctrine)). The pass-through doctrine is limited by the Severin doctrine, "which dictates that a prime contractor cannot recover from an owner for damages incurred by a subcontractor unless the prime contractor is itself liable to the subcontractor for those amounts." Id. (citingClark-Fitzpatrick, Inc., 652 A.2d at 449 (citingSeverin v. U.S., 99 Ct.Cl. 435 (1943))) (emphasis in original). "It is insufficient proof for a prime contractor who is suing an owner to prove that his [or her] subcontractor has sustained injury or damage through fault of the owner unless the prime contractor goes further and shows that he [or she] somehow is responsible to the subcontractor for those damages."Aetna Bridge Co. v. R.I. Dep't of Transp.,795 A.2d 517, 524 n. 13 (R.I. 2002) (citing Dep't ofTransp. v. Claussen Paving Co.,246 Ga. 807, 810-11, 273 S.E.2d 161, 164 (1980)).
In its motion, Burman characterizes GNI's claim for $104,031.19 as a pass-through claim for work performed by Alpha Omega on the Project. Burman contends that GNI has failed to make an unequivocal admission of liability to Alpha Omega on the record, such that theSeverin doctrine bars the pass-through claim. GNI avers, however, *Page 13 
that the pass-through doctrine is not applicable to its claim. This Court is inclined to agree. As determined by the trial justice in the Alpha Omega Litigation, and as affirmed by the Rhode Island Supreme Court, Alpha Omega was not a subcontractor of GNI on the Project. GNI does not dispute this finding. (Pl.'s Opp. at p. 9 n. 2.) Thus, absent a prime contractor/subcontractor relationship between GNI and Alpha, the pass-through doctrine and the accompanying Severin doctrine have no bearing on GNI's claim in this dispute.
 B Collateral Estoppel
"Under the doctrine of collateral estoppel, `an issue of ultimate fact that has been actually litigated and determined cannot be re-litigated between the same parties or their privies in future proceedings.'" Foster-Glocester Reg'l School Comm. v. Bd. ofRev., 854 A.2d 1008, 1014 (R.I. 2004) (citing George v.Fadiani, 772 A.2d 1065, 1067 (R.I. 2001) (per curiam) (quoting Casco Indemnity Co. v. O'Connor,755 A.2d 779, 782 (R.I. 2000))). "Subject to situations in which application of the doctrine would lead to inequitable results, [the Rhode Island Supreme Court] ha[s] held that courts should apply collateral estoppel when the case before them meets three requirements: (1) the parties are the same or in privity with the parties of the previous proceeding; (2) a final judgment on the merits has been entered in the previous proceeding; [and] (3) the issue or issues in question are identical in both proceedings."Foster-Glocester Reg'l School Comm., 854 A.2d at 1014 (citingLee v. R.I. Council 94, A.F.S.C.M.E., AFL-CIO, Local 186,796 A.2d 1080, 1084 (R.I. 2002) (per curiam) (citingWilkinson v. State Crime Laboratory Comm'n,788 A.2d 1129, 1141 (R.I. 2002))). *Page 14 
"When properly invoked, collateral estoppel prevents the same parties from re-litigating the same facts `in any future lawsuit,' regardless of whether the cause of action differs from the prior proceeding." Schultz v. State, C.A. No. PC-05-5844, 2008 WL 2337111 (R.I. Super. Ct. May 28, 2008) (quoting Garganta v. Mobile Village, Inc.,730 A.2d 1, 4 (R.I. 1999)). "Collateral estoppel cannot apply [,however,] when the party against whom the earlier decision is asserted did not have a `full and fair opportunity' to litigate that issue in the earlier case." Casco Indemnity Co.,755 A.2d at 783 (quoting Allen v. McCurry,449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308, 313 (1980)). The determination of whether collateral estoppel should be applied presents a question of law. Casco Indemnity Co.,755 A.2d at 782 (citing Mulholland Constr'n Co. v. LeePare Assocs., Inc., 576 A.2d 1236, 1237 (R.I. 1990)).
In this case, the parties do not dispute that a final judgment on the merits was entered in a previous proceeding. Thus, this Court need only address the remaining two requirements of the collateral estoppel doctrine — identity of issues and privity — to determine any preclusive effect of the prior litigation on the evidence subject to this motion.
 1 Identity of Issues
The Rhode Island Supreme Court has subdivided the first requirement, identity of issues, into three factors: (1) the issue sought to be precluded must be identical to the issue determined in the earlier proceeding, (2) the issue must actually have been litigated in the prior proceeding, and (3) the issue must necessarily have been decided. State v. Godette,751 A.2d 742, 746 (R.I. 2000) (citing State v. Hie,688 A.2d 283, 285 (R.I. 1996) *Page 15 
(quoting State v. Chase, 588 A.2d 120, 123 (R.I. 1991) (overruled on other grounds))); E.W. Audet Sons,Inc. v. Fireman's Fund Ins. Co. of Newark,635 A.2d 1181 (R.I. 1994). Thus, in contrast to claim preclusion (orres judicata), the doctrine of collateral estoppel does not apply to matters which might or could have been litigated but were not. Foster-Glocester Reg'l School Comm.,854 A.2d at 1014 n. 2.
Here, Burman and GNI dispute whether the issues sought to be precluded in this action are identical to the issues determined in the Alpha Omega Litigation. Burman contends that the Alpha Omega Litigation resulted in a specific determination that the final adjusted Subcontract price was $588,000.000, inclusive of both Change Order No. One and Change Order No. Two., and that no cost-plus agreement beyond that fixed price existed from which Alpha Omega sought to be compensated. Burman also maintains that the trial court's finding concerning the binding nature of GNI's Lien Waivers on Alpha Omega in the Alpha Omega Litigation is conclusive as to the applicability of those waivers to GNI's claim for $104,031.19 in the instant matter.
GNI argues, to the contrary, that the trial court's decision in the Alpha Omega Litigation did not conclusively establish that GNI is entitled to no more than $588,000.00 for its work on the Project. Specifically, GNI contends that even if the Subcontract were a fixed price contract, such a contract price still could be increased pursuant to a change order — here, Change Order No. Two. GNI points to the Subcontract itself — specifically, a provision found in § 6 of the Subcontract governing "change orders and changes." This provision reads as follows:
 6. Change orders and changes. No changes shall be made in the work except upon the written order of the Contractor. The amount to be paid by the Contractor, or allowed by the Subcontractor, by virtue of the change is to be stated in said change order. In the event of any additional work *Page 16 
covered by a change order, the amount of compensation to be paid, providing the change is approved by a written order of the Contractor, shall be determined as follows:
 a. By such applicable unit prices as set forth in the contract, or
 b. If no such unit prices are set forth, then by a lump sum mutually agreed upon by the General Contractor and the Subcontractor, or
 c. If no such unit prices are set forth, and if the parties cannot agree upon a lump sum, then by the actual net cost in money to the Subcontractor of material and labor (including workmen's compensation insurance and payroll taxes) required, plus rental of equipment (other than tools), plus compensation of the percentage overhead and the percentage for profit set out in the annexed Schedule. . . .
(Pl.'s Opp. Ex. A: Subcontract at § 6.)
Based on this contract language, as well as the Addendum, GNI intends to argue at trial that there existed no meeting of the minds as to the parties' intended purpose of the $100,000.00 payment issued pursuant to Change Order No. Two. GNI avers that Change Order No. Two was not a "lump sum" agreement as described in § 6(b) of the Subcontract, but rather a "cost-plus" change order executed under § 6(c). GNI maintains, therefore, that the issue here centers on whether there was a meeting of the minds as to Change Order No. Two, which GNI contends was not addressed in the Alpha Omega Litigation. GNI further characterizes any determinations by the trial court in the Alpha Omega Litigation relative to the existence of a fixed price Subcontract and the binding nature of the lien waivers as judicial dicta and non-essential to the judgment in the Alpha Omega Litigation.
As noted in the Restatement (Second) of Judgments, one of the most difficult problems a court faces in the application of collateral estoppel is the delineation of the *Page 17 
issue on which litigation is, or is not, foreclosed by a prior judgment. See Restatement (Second) of Judgments § 27 cmt. c (1982). "The problem involves a balancing of important interests: on the one hand, a desire not to deprive a litigant of an adequate day in court; on the other hand, a desire to prevent repetitious litigation of what is essentially the same dispute." Id.
Here, an issue that GNI seeks to litigate — whether Burman is liable for labor costs incurred by Alpha Omega over and above the Subcontract price — is essentially the same issue decided in the Alpha Omega Litigation. The trial court ultimately held that there existed no probability of judgment in favor of Alpha Omega, based on the binding effect of the lien waivers signed by GNI upon Alpha Omega as an employee, and the finding of "not a scintilla of evidence" to support entitlement to a mechanics' lien. In reaching this ultimate finding, the trial court considered several sub-issues, including whether Burman and GNI agreed upon a final fixed price adjustment by way of Change Order No. Two. After considering this issue, the trial court made a finding of fact that GNI and Burman were working on a fixed-price contract, which should have alerted Alpha Omega to make known to Burman any cost-plus arrangements. (Decision at p. 284.) The trial court based this finding on testimony by Edward Burman, which the court found to be more credible than testimony submitted by witnesses for Alpha Omega. See Decision at pp. 283-85; Tr. at 151-57; 180-81.
This particular finding of fact was essential to the trial court's ultimate holding as to Burman's liability for Alpha Omega's labor costs. A contrary finding of a separate cost-plus agreement between GNI and Burman, or even a finding that negotiations were held open as to additional compensation for stonework, may have constituted sufficient *Page 18 
evidence to prevent the dismissal of Alpha Omega's lien. Hypothetically, if the Subcontract amount was not finalized, Alpha Omega may have been able to show at trial that it was entitled to the Labor Costs outside of the $588,000.00 stated in Change Order No. Two, despite the lien waivers.
Thus, this Court finds that the issues GNI now seeks to litigate relative to the Subcontract amount and the Labor Costs are identical to the issues addressed in the Alpha Omega Litigation. This Court also finds that the trial court's determination as to the fixed-price nature of the Subcontract was essential to the formulation of the decision and judgment and was not mere judicialdicta as GNI here contends. See Restatement (Second) of Judgments § 27 cmt. j. (The appropriate question in deciding whether a prior determination was essential to a judgment is "whether the issue was actually recognized by the parties as important and by the trier as necessary to the first judgment.").
To find an "identity of issues" for purposes of collateral estoppel, the Rhode Island Supreme Court requires that the issues not only be identical, but also that they were "actually litigated" and "decided" in the prior proceeding. Godette,751 A.2d at 746. An issue is "actually litigated" when it is properly raised by the pleadings or otherwise, is submitted for determination, and is in fact determined by the trier of fact.See Restatements (Second) of Judgments § 27 cmt. d. As discussed, the Alpha Omega Litigation transcript reflects that the parties clearly disputed whether Burman, as the general contractor on the Project, owed Alpha Omega the Labor Costs; more particularly, they disputed whether Burman owed Labor Costs above and beyond the amount paid to GNI pursuant to the Subcontract. See
Tr. at pp. 67, 69, 71, 118-20, 148, 151-57. Counsel for both parties addressed the "cost-plus" argument in their respective closing *Page 19 
statements. The trial justice made specific findings of fact as to this issue and ultimately resolved the dispute. Thus, this Court finds that the matters at issue were actually litigated and decided. Accordingly, an identity of issues between the Alpha Omega Litigation and this case exists.
This Court also notes that while GNI maintains that the Addendum and more recent deposition testimony create a "new issue" as to the parties' intentions in executing Change Order No. Two, such "new evidence" or new legal theory does not preclude a finding by this Court of an identity of issues relative to collateral estoppel. An exception to collateral estoppel generally cannot be grounded on an alleged discovery of more persuasive evidence, as otherwise there would be no end to the litigation. Roos v. Red,130 Cal.App.4th 870, 888, 30 Cal.Rptr.3d 446, 459
(Cal.App. 2 Dist. 2005). New evidentiary facts may not be adduced to obtain a different determination of an issue of ultimate fact litigated in a prior proceeding nor may new arguments be presented to obtain a different determination of an issue of law. See Restatement (Second) of Judgments § 27 cmt. c. While some jurisdictions have recognized exceptions to this principle, such as the unavailability of new evidence at the prior proceeding or consequent unfair circumstances, see, e.g., State FarmFire Cas. Co. v. Century Home Components, Inc.,275 Or. 97, 109-10, 550 P.2d 1185, 1191 (1976); Roos,130 Cal.App.4th at 880, 30 Cal.Rptr.3d at 452-53, GNI has failed to show any such circumstances here. Moreover, GNI alleges that John Abatecola sent the Addendum to Burman in September of 2006, and thus the Addendum would have been in existence and available during the Alpha Omega Litigation. Notwithstanding its availability, the trial record in the Alpha Omega Litigation is absent of any reference by the parties to the *Page 20 
Addendum, despite documentary evidence of GNI's correspondence with both Alpha Omega and Burman in December of 2006 concerning Alpha Omega's claim. See Def.'s Reply Mem. Ex. 7: Correspondence.
 2 Identity of Parties
Identity of parties exists when the parties are the same or in privity with the parties from the prior proceeding. Duffy v.Milder, 896 A.2d 27, 36 (R.I. 2006). Parties are considered to be in privity with one another when "there is a commonality of interest between the two entities and when they `sufficiently represent each other's interests.'" Ferguson, 745 A.2d at 156 (quotingCommercial Union Ins. Co. v. Pelchat,727 A.2d 676, 680 (R.I. 1999) (quoting Studio Art Theatre ofEvansville, Inc., v. City of Evansville Indiana,76 F.3d 128, 131 (7th Cir. 1996), cert. denied,519 U.S. 866, 117 S.Ct. 177, 136 L.Ed.2d 117 (1996))). A party will not be precluded from litigating the second case, however, if he or she did not have the opportunity to fully and fairly litigate the issue in the prior proceeding. Casco Indemnity Co.,755 A.2d at 783. The determination of who are privies requires careful examination into the circumstances of each case.See Satsky v. Paramount Communications, Inc.,7 F.3d 1464, 1468-69 (10th Cir. 1993).
Here, Burman maintains that there exists an identically aligned interest between GNI and Alpha Omega with regard to recouping the Labor Costs. Burman points to GNI's admission that $104,031.19 of the damages it now seeks comprises the exact costs incurred by Alpha Omega on the Project. Burman also relies on the trial justice's finding in the Alpha Omega Litigation that Alpha Omega laborers worked as employees of GNI, with no attempt by GNI to subcontract the work. (Decision at p. 283.) GNI counters that *Page 21 
there existed no sufficient representation by Alpha Omega of GNI's interests to establish privity for purposes of collateral estoppel.[8] GNI emphasizes that Alpha Omega was not privy to all Subcontract negotiations or to the alleged conversation between GNI principal John Abatecola and Burman principal Edward Burman as to the intent of the $100,000.00 payment under Change Order No. Two.
It is undisputed that GNI and Alpha Omega share a commonality of interests given that both entities seek to recover the outstanding Labor Costs allegedly owed to Alpha Omega. Consequently, GNI attempts to avoid the preclusive effects of collateral estoppel by revealing an alleged lack of sufficient representation by Alpha Omega of GNI's interests in the Alpha Omega Litigation. GNI validly directs this Court to testimony in the prior proceeding indicating that Alpha Omega was not present during the negotiations and agreement resulting in the execution of Change Order No. Two. (Tr. at pp. 118; 148.) Yet, GNI's reliance on this testimony is misplaced.
Privity, as used in the context of collateral estoppel, "does not embrace relationships between persons or entities, but rather it deals with a person's [or entity's] relationship to the subject matter of the litigation," Richburg v. Baughman,290 S.C. 431, 434, 351 S.E.2d 164, 166 (1986), and denotes a mutual or successive relationship to the same rights or thing.See Hales v. North Carolina Ins. Guar. Ass'n,337 N.C. 329, 334, 445 S.E.2d 590, 594 (1994); Owen v.Miller, 414 So.2d 889, 891 (Ala. 1981). Here, GNI's claim for the Labor Costs originates from the work performed by Alpha Omega as GNI's employee. In the Alpha Omega Litigation, Alpha Omega sought to recover the exact costs from Burman that GNI now seeks to recover in the instant action. At the *Page 22 
time of the prior proceeding, GNI had apparently ceased operating, providing Alpha Omega with tremendous incentive to recover the Labor Costs from Burman, given the unlikelihood of such recovery from GNI. Moreover, certain correspondence exchanged among counsel for GNI, counsel for Burman, and counsel for Alpha Omega, and admitted as exhibits during the Alpha Omega Litigation, indicates that GNI was aware of Alpha Omega's mechanics' lien claim in December of 2006. This notice provided GNI a full opportunity to assist Alpha Omega in its collection efforts by disclosing any pertinent and helpful information, such as the Addendum. Additionally, there is no conflict of interest between GNI and Alpha Omega that this Court can discern to preclude a finding of sufficient representation. See Williamson v. State FarmLloyds, 76 S.W.3d 64, 67-68 (Tex.App. 2002); Slocum on Behalfof Nathan A. v. Joseph B.,183 A.D.2d 102, 588 N.Y.S.2d 930 (1992).
Furthermore, privity is not defeated because the parties raise a different theory or cause of action in support of their rights of recovery. See Evans v. Celotex Corp.,194 Cal.App.3d 741, 746 (1st Dist. 1987) (citing Zaragosa v.Craven, 33 Cal.2d 315, 202 P.2d 73 (1949)). Just as GNI's "new" argument concerning the parties' intent behind the execution of Change Order No. Two does not defeat a finding of issue identity necessary for invocation of collateral estoppel, it similarly does not overcome the extant privity between GNI and Alpha Omega needed for that doctrine to apply. Based on the commonality of interests between Alpha Omega and GNI, and the sufficient representation of these interests by Alpha Omega in the Alpha Omega Litigation, this Court thus finds an identity of parties for purposes of collateral estoppel. *Page 23 
 3 Balancing of the Equities
Notwithstanding a determination that the identity of issues and parties and final judgment requirements of collateral estoppel have been met in a particular case, a Rhode Island court may decline to apply collateral estoppel in a situation where use of the doctrine would lead to an inequitable result. Casco Indem. Co.,755 A.2d at 782. "Although the legal standard governing collateral estoppel is clear, `it is not to be mechanically applied, for it is capable of producing extraordinarily harsh and unfair results.'"Id. (quoting Remington Rand Corp. v. Amsterdam-RotterdamBank, N.V., 68 F.3d 1478, 1486 (2d Cir. 1995)); seeState v. Gautier, 871 A.2d 347 (R.I. 2005).
Under the factual circumstances before this Court, a balancing of the equities weighs in favor of estopping GNI from essentially re-litigating the terms of the Subcontract as to price and presenting a claim for the Labor Costs and certain "extra costs" in the instant action. As discussed, GNI had a "full and fair opportunity" to litigate this issue through Alpha Omega's sufficient representation of the entities' common interest during the Alpha Omega Litigation and the subsequent Supreme Court appeal.See George, 772 A.2d at 1068. Moreover, GNI has failed to show why its proffered additional evidence of a cost-plus arrangement with Burman was not available during the Alpha Omega Litigation. Thus, precluding GNI from bringing its claim for the Labor Costs, as well as the alleged "extra costs" of $32,618.00, based on its "new" legal theory concerning the intent behind Change Order No. Two would not lead to an inequitable or unfair result.[9] *Page 24 
 C Lien Waivers
GNI further maintains that the trial court's finding in the Alpha Omega Litigation concerning the binding effect of the Lien Waivers signed by GNI upon Alpha Omega has no impact in this case. Specifically, GNI argues that the wavier of lien signed in December of 2006 did not purport to be a final payment affidavit or waiver and that such documents were merely a waiver of lien rights.See Pl.'s Opp. Ex. D: Waiver dated December 4, 2006. This Court is of the view, however, that it need not consider the legal effect of the Lien Waivers on GNI's claim for costs in excess of the $588,000.00 Subcontract price in the context of this Motion. Based on the findings of the Alpha Omega Litigation, and the subsequent review of such findings by the Rhode Island Supreme Court, GNI is collaterally estopped from presenting evidence in this case indicating that the final Subcontract price for the stonework was anything greater than $588,000.00, inclusive of both Change Orders. Thus, the question of whether the Lien Waivers bar GNI's claim for any alleged additional costs appears to no longer be an issue. *Page 25 
 III Conclusion
For all of these reasons, this Court finds that Plaintiff Greenwich Northeast, Inc. is collaterally estopped from presenting evidence demonstrating that the final Subcontract price is greater than $588,000.00. Plaintiff GNI is likewise precluded from offering evidence of costs incurred on the Project in excess of the Subcontract price of $588,000.00 when presenting its claim for breach of contract. Hence, Defendant E.W. Burman, Inc.'s Motion in Limine is granted. Counsel shall confer and submit forthwith for entry by this Court an agreed upon form of order that is consistent with this Decision.
[1] The architect on the Project was Mr. Cornelius deBoer of Haynes/deBoer Associates (the "Architect"). (Def.'s Pre-Trial Mem. ¶ 3.)
[2] Burman's counterclaim alleges breach of contract for defective and delayed performance (Count I), breach of contract for violation of prohibited subletting (Count II), breach of contract for failure to keep the Project clear of mechanics' liens (Count III), breach of contract for violating the duty to defend and indemnify (Count IV), and fraudulent misrepresentation (Count V). It also seeks injunctive and declaratory relief from this Court (Counts VI and VII).
[3] By the time Alpha Omega initiated the Alpha Omega Litigation, John Abatecola of GNI apparently had ceased operating GNI within Rhode Island and moved to Florida. (Def.'s Pre-Trial Mem. ¶ 26.)
[4] Throughout the duration of performance of its work under the Subcontract, GNI executed affidavits and waivers of lien (the "Lien Waivers"). (Def.'s Reply Mem. in Support of Motion (hereinafter, "Def.'s Reply Mem.") Ex. 6: Lien Waivers.) The Lien Waivers stipulate that GNI had been paid in full, paid its suppliers, waived its right of lien, and acknowledged a duty to defend and indemnify Burman against claims of suppliers, as of a certain date.
[5] After the filing of the instant action, Alpha Omega instituted a separate action against GNI, captioned Alpha OmegaConstruction, Inc. v. Greenwich Northeast, Inc., C.A. No. PC-08-3854; however, the docket reflects that that no filings have been made in that case since the filing of the Defendant's answer on July 11, 2008.
[6] Testimony by Edward Burman further details his recount of the final Subcontract negotiations and reiterated Burman's position that both parties willingly agreed upon $100,000.00 as a final price adjustment to complete the Project. (Tr. at pp. 151-57.)
[7] Alpha Omega also appealed a judgment awarding attorney's fees to Burman.
[8] In its Opposition, GNI admits that "there is some commonality of interest between GNI and Alpha Omega in that a portion of the funds each are seeking involve the same group of funds. . . ." (Pl.'s Opp. at p. 12.)
[9] In its Reply Memorandum, Burman dedicates a significant portion of its "balancing of the equities" argument to the proposition that the "overwhelming documentary evidence" submitted at trial substantiates the trial justice's finding of a $588,000.00 fixed price Subcontract in the Alpha Omega Litigation. (Def.'s Reply Mem. pp. 3-5.) While this Court is inclined to agree, a party seeking collateral estoppel need not demonstrate a certain quantity or quality of argument or evidence addressed to an issue.In re Bush, 62 F.3d 1319, 1323 (11th Cir. 1995). Instead, the party need only prove that the issue was "actually litigated in the prior proceeding and that the evidence was not restricted. . . ."Murphy v. Murphy,164 Cal.App.4th 376, 401, 78 Cal.Rptr.3d 784, 803 (1st Dist. 2008). Burman also argues that principles of equity favor collaterally estopping GNI from presenting evidence of costs exceeding the Subcontract price because GNI made material misrepresentations in executing the Lien Waivers. The Court made no findings of misrepresentation in the Alpha Omega Litigation, however, and this Court refrains from making such findings in connection with this Motion.